Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
YUSUKE BANNO, et al.,

                              Plaintiffs,

              -versus-                                          06 CV 2270 (KMK)(JCF)

THE CITY OF NEW YORK, et al.

                              Defendants.
------------------------------------------------------------------------ x

## DECLARATION OF DEPUTY
## COMMISSIONER DAVID COHEN

  **DAVID COHEN** declares, under penalty of perjury pursuant to 28 U.S.C. §1746, that the following statements are true and correct:

  1. I am the Deputy Commissioner for Intelligence for the New York City Police Department ("NYPD"), a position I have held since February of 2002. In that capacity, I have general oversight of the Intelligence Division, the unit within the NYPD which gathers and analyzes information to assist in the detection and prevention of unlawful activity, including acts of terror. I have personal knowledge of the facts set forth below and submit this declaration in support of the City's motion made for the purpose of preventing the disclosure of the identity and physical appearance of Undercover Badge 6216.

  **A.** **Qualifications and Experience**

  2. In addressing the matter of releasing intelligence information, and information about the appearance and identity of undercover officers in particular, I draw on my background and experience, not only as the NYPD Deputy Commissioner for Intelligence for the last five and a half years, but also as a professional intelligence officer for the past forty-one years. As I

have previously articulated in my Declaration of June 6, 2007 ("June 6 Declaration"), for thirty-five of those years I served with the Central Intelligence Agency ("CIA") where I held the positions of Associate Director for Intelligence and Deputy Director of Operations.  For the Court's convenience, I am attaching a copy of that Declaration and its exhibits hereto as Exhibit "A."

## B.       Disclosure Of The Undercover's Identity Will Result In Substantial Harms

3.       I am personally familiar with the work of Undercover Badge 6216 and with this litigation.  My staff and I have closely monitored this litigation in an effort to assure the non-disclosure of the identity of Badge 6216 to anyone outside the Department.  We have done so to advance all of the interests that I have previously articulated in my June 6 Declaration.  I reaffirm and incorporate all of that testimony here by reference

4.       In addition to the testimony that I provided on June 6, I emphasize that Badge 6216 is currently involved in investigative activities that require his continued anonymity.  Were his identity to be revealed, Badge 6216 could no longer be employed in the role he currently plays.  The loss of Badge 6216's services would adversely affect the investigative activity in which he is currently participating.

5.       The disclosure of the identity of Badge 6216 would constitute a substantial loss to the NYPD's undercover program.  This is so for all of the reasons that I set forth in my June 6 Declaration, not least of which is that the NYPD has invested very substantial time, money and other resources in the training of every undercover officer including Badge 6216.  The NYPD works strenuously to avoid the loss of these officers and makes every effort to facilitate and encourage alternatives to any such loss.

6.    As I testified in my June 6 Declaration, the disclosure of any undercover officer's identity, including the identity of Badge 6216, jeopardizes both the undercover officer's and his family's personal safety.

7.    I am advised that the Magistrate's order provides that Badge 6216 "need not reveal his identity, but he shall [be deposed] without a screen or disguise." Were Badge 6216 to sit for examination, which I am advised may continue for several hours in the presence of several attorneys for plaintiffs, substantially all of the visual information about Badge 6216's physical appearance would have been disclosed to those attorneys unless a screen or an appropriate disguise is employed.

8.    From an intelligence perspective, disclosure of an undercover officer's undisguised appearance to anyone outside the department is considered a serious compromise of that officer's ability to function in an undercover capacity. Therefore, disclosure of Badge 6216's physical appearance to several plaintiffs' counsel in the course of a deposition will be considered disclosure of his physical appearance to the general public.

9.    As stated in the Law Department's July 27, 2007 letter to Judge Francis requesting that Badge 6216 be permitted to appear at his deposition in a disguise of a wig and mustache, from the Intelligence Division's standpoint an appropriate disguise is necessary to preserve NYPD's ability to use him as an undercover in the future. For this deposition, in light of the other protections afforded in Judge Francis's order, a wig and mustache are the minimal acceptable disguise that I, as an intelligence professional, believe is necessary for preserving Badge 6216's ability to function as an undercover.

10.    As I have explained in more detail in my June 6 Declaration, the effectiveness of the NYPD's intelligence program hinges on our ability to attract, deploy, retain and protect the

identities of our intelligence personnel. Action that undermines these elements endangers New York City by damaging the intelligence program. The action directed by the Magistrate's orders concerning Badge 6216 directly undercuts the department's efforts to protect the identity of Badge 6216, to retain him within the undercover program, and to attract other qualified officers to that program.

11.    For all of these reasons, and for the reasons set forth in more detail in my June 6 Declaration, the Intelligence Division firmly advocates that the Court permit Badge 6216 to give his deposition testimony in this case in a disguise that permits him to avoid the disclosure of his physical appearance.

### C.    <u>Conclusion</u>

12.    Requiring Badge 6216 to sit for examination without the use of a disguise to shield his physical appearance will disclose his identity to anyone present; will adversely affect the ongoing investigations in which Badge 6216 is involved; will result in a substantial loss to the NYPD's undercover program; and jeopardizes his and his family's personal safety.

Dated: New York, New York
        August 21, 2007

_____
        David Cohen
        Deputy Commissioner for Intelligence

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MICHAEL SCHILLER, FRANCESCA          :
FIORENTINI, ROBERT CURLEY, and        :
NEAL CURLEY,                         :
                                     :
                  Plaintiffs,        :
          vs.                        :
                                     :        04 Civ. 7922 (KMK) (JCF)
                                     :
The CITY OF NEW YORK; RAYMOND        :
KELLY, Commissioner of the New York City  :
Police Department; TERENCE MONAHAN,  :
Assistant Chief of the Bronx Bureau of the New  :
York City Police Department,         :
                                     :
                  Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HACER DINLER; ANN MAURER;            :
ASHLEY WATERS;                       :
                                     :
                  Plaintiffs,        :
                                     :        04 Civ. 7921 (KMK) (JCF)
          vs.                        :
                                     :
The CITY OF NEW YORK; RAYMOND W.     :
KELLY, Commissioner of the New York City  :
Police Department,                   :
                                     :
                  Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DEPUTY COMMISSIONER DAVID COHEN

   **DAVID COHEN** declares, under penalty of perjury pursuant to 28 U.S.C. §1746, that

the following statements are true and correct:

   1.    I am the Deputy Commissioner for Intelligence for the New York City Police

Department ("NYPD"), a position I have held since February of 2002.  In that capacity, I have

general oversight of the Intelligence Division, the unit within the NYPD which gathers and analyzes information to assist in the detection and prevention of unlawful activity, including acts of terror. I have personal knowledge of the facts set forth below and submit this declaration in support of the City's motion to protect certain Intelligence Division documents from disclosure to plaintiffs.

## A.    Qualifications and Experience

2.     In addressing the matter of releasing intelligence documents, I draw on my background and experience, not only as the NYPD Deputy Commissioner for Intelligence for the last five and a half years, but also as a professional intelligence officer for the past forty-one years.[1] For five of those years, I served as the Associate Director for Intelligence for the Central Intelligence Agency ("CIA"), and as such, was the CIA's senior professional responsible for the preparation of all finished intelligence analysis provided to the nation's national security leadership at the highest levels, including the President.

3.     I also served for ten years in the CIA's Directorate of Operations, including two years as the Deputy Director of Operations, the senior-most person responsible for world-wide collection of raw, unevaluated intelligence. In both positions I was a full member of the CIA's Executive Committee which is responsible for developing and implementing policies affecting all aspects of intelligence at the CIA.

## B.    Document Review

4.     I have personally read all of the documents generated by the Intelligence Division in connection with the NYPD's preparation for the Republican National Convention ("RNC") which are responsive to plaintiffs' document request. As a result of my page by page review of

---

[1] For thirty-five of those years I served with the Central Intelligence Agency.

the documents, I am able to provide reliable and accurate information to the Court concerning the documents.

5.       As an initial matter, it is important for the Court to understand that until my reading of these documents over the past weeks, I had not read the raw, unevaluated field intelligence reports and open source material upon which the end-user reports already produced in this litigation were based.  Having now read them, I can therefore state with certainty that none of the documents contain information which contradicts, modifies or places in a different light, the information contained in the reports.  In fact, they reinforce and corroborate the reports.  Moreover, I also can affirm that raw, unevaluated field intelligence reports were not made available to the RNC Executive Committee[2]. Only the end-user reports that have been produced in this litigation were made available to that Committee.

6.       The documents I reviewed fall into five categories: (1) the end-user reports (Bates nos. 102515-103117); (2) raw, unevaluated field intelligence reports,[3] all of which were prepared by undercover police officers from the Intelligence Division[4] and which, I believe, fall fully within the law enforcement privilege (3) 84 other documents prepared by the Intelligence

---

[2] The RNC Executive Committee consisted of the Police Commissioner, the Chief of Department and other NYPD executives with responsibility for preparation for the RNC.

[3] Defendants cannot indicate the number of raw, unevaluated field intelligence reports without disclosing information relative to the undercover capability of the Intelligence Division.

[4] The undercover officers who prepared the field reports were engaged in investigations authorized under specific provisions in the Patrol Guide known as the Handschu Guidelines. These guidelines authorize the Intelligence Division to conduct online searches and access online sites and forums on the same terms and conditions as members of the public.  When information is obtained that an individual or group advocates the commission of unlawful acts or information otherwise indicates the possibility that an individual or group will engage in unlawful conduct, the NYPD may then use appropriate law enforcement tools, including specially trained undercover personnel and confidential informants, to conduct an investigation.

Division that I believe are fully privileged; (4) 177 documents containing privileged information, most of which can be redacted without destroying the sense of the documents, and (5) open source material requiring no redactions.

      7.     The City asserts the law enforcement privilege over all the raw, unevaluated field intelligence reports (category (2) from ¶6), the 84 other documents that I believe cannot be redacted (category (3) from ¶6) and the redacted portions of the 177 documents that I believe can be redacted without destroying the sense of the document (category 4 from ¶6). Release of these documents or redacted portions thereof would reveal information about sources and methods. Consequently, release would severely damage the NYPD intelligence program, and in turn, seriously undercut its ability to contribute to the security and safety of New York City in this post 11 September 2001 era.

      8.     In order to provide appropriate background and context concerning the reasons that the raw, unevaluated field intelligence reports and other redacted information should not be revealed, I attach a narrative I have previously prepared as an Appendix. It provides contextual information concerning the NYPD's intelligence program and the role it plays in the NYPD's efforts to fulfill its law enforcement responsibilities. The Appendix is annexed as exhibit A and is incorporated by reference in this declaration.

**C.**     <u>Protecting Sources and Methods</u>

      9.     The strength, vigor and sustainability of the NYPD intelligence program, like any effective intelligence program, in large part hinges on the following elements:

- The ability to attract, deploy, retain and protect the identities of intelligence personnel --- either undercover members of the service or confidential informants working for us.

- The development, application and protection of methodologies or methods of operation deemed necessary to successfully gather, process, analyze, and disseminate intelligence information to end-users.

Action that undermines these elements endangers New York City by damaging the intelligence program and, therefore, should not be taken without great cause.

**D.    Sources**

10.    The greatest vulnerability the NYPD intelligence program faces is the release of information that would reveal or tend to reveal the identity of its sources. The inappropriate sharing of such information would simply endanger the lives and safety of the people who are identified either as undercover personnel or confidential informants. Our inability to protect the names and/or identities of these persons would not only put them directly at risk, but would severely damage our effectiveness in protecting New York City for the indefinite future by raising serious doubts about our ability to protect anyone willing to work for us as either undercover members of the service (employees of the NYPD Intelligence Division) or Intelligence Division confidential informants.

11.    Reflecting the damage that would occur to our information gathering abilities --- and therefore our ability to defend New York City from another terror attack or other threats of criminal activity--- we have gone to great lengths to protect identity information. With respect to our Intelligence Division undercover personnel --- the only NYPD undercovers authorized to operate against terrorist persons or groups --- their identities are without exception the most protected personnel information in the NYPD; the individuals involved, for example, neither participate in departmental training programs nor promotion exercises. Both training and promotions are accomplished within the strictest security protocols at locations unknown to anyone but the undercovers and their immediate supervisors.

12.    The accidental or intended release of strands of information that could reveal the identity of any one of these persons --- whether active or inactive --- would cause irreparable harm to our ability to recruit members of the service into this sensitive aspect of our law enforcement mission. The ricochet effect on our ability to secure New York City's public safety and security in the post 11 September period would be severe and permanent. Because of this, the release of such information remains of highest concern within the Intelligence Division.

13.    The preservation of confidentiality is also important in our relationships with other law enforcement agencies on the international, federal , state and local levels. Appendix at 3,4. The Intelligence Division has earned a global reputation which makes it possible for the NYPD to have access to vital information. Appendix at 4. For example, it is this reputation that underpinned the willingness of Spanish officials to welcome an NYPD presence in Madrid within hours of the March 11, 2004 Madrid train bombing; the NYPD was the only foreign law enforcement agency on-site and the information gathered there helped strengthen our own subway security as the Madrid investigation unfolded. Id. If we are unable to protect our sources and methods, the ability of other law enforcement agencies to trust that information they provide will remain confidential will diminish our relationships with those agencies and compromise those sources of vital information.

**E.    Methods**

14.    Protecting the methodologies used to train, deploy, manage and communicate with our personnel, or information that would provide knowledge of the capabilities, size and scope of the NYPD intelligence program is essential to the operational integrity of our program. The following types of information are among those that would reveal our methodologies:

- The persons, groups or organizations about whom information is being obtained.

- Locations where information gathering personnel are deployed, either inside New York City or elsewhere.

- Information that would be revealing of tradecraft techniques, such as how undercovers or informants travel or communicate.

- Information describing how undercovers or informants establish their "bona fides".

15.     As with identity protection, we limit access to knowledge about our methods. In this regard, we have identified the raw, unevaluated field reports prepared by or on behalf of undercover persons or confidential informants as our single greatest vulnerability. We conclude this because these reports contain extremely detailed information regarding meeting places, times of meetings, persons met, relationships between undercover persons or confidential informants and others they might know, and methods of communication.

16.     The raw, unevaluated field reports co-mingle the substance of our information gathering effort with data that is or tends to be both source and methods revealing. They contain information reported by undercover officers to their contacts within the NYPD, known as handlers, and include the following categories of information:

> Case Number
> Date of Report
> Date of Opening of investigation
> Unit reporting
> Person reporting
> Date, time and location of activities being reported on
> Description of activities, including name of organization(s), name and/or description of individual(s), meeting attended, topics discussed, conversations engaged in or overheard, things observed.

17.     Disclosure of any portion of the information contained in a raw, unevaluated intelligence field report would  facilitate the following:

(1) identification of the source of the information in the document and the disclosure of the identity of an undercover officer or confidential informant.

(2) disclosure of the size and capabilities of the NYPD undercover program.

(3) disclosure of the trade craft, policies, modes of operation and methods used by the NYPD in an undercover investigation.

18.    Listed below are the specific ways in which disclosure of information from the raw, unevaluated intelligence field reports can have these results:

- **Case Number** - from the case number, information about the number of investigations undertaken by the Intelligence Division can be ascertained. The number of investigations reveals information about the scope of our investigative activities.

- **Date of report** - corresponds to the date of the activities reported on. Taken together with information from other documents it discloses the scope of our investigative activities by revealing the total number of matters reported upon.

- **Date of Opening of Investigation** - will provide detail about length of involvement of NYPD personnel in particular matter and provide information about when the attention of NYPD to a particular matter could begin. Taken together with data from other documents reveals scope of our investigative activities.

- **Unit reporting** - will disclose the name of unit within NYPD Intelligence Division conducting the investigation. Coupled with information from other sources and documents, it could reveal scope of activities of the particular unit and provide comparative data on activities of other units.

- **Person reporting** - Reveals name of NYPD handler, some of whom are still active in undercover investigations. Handlers are engaged in confidential assignments and are known only by NYPD Intelligence Division personnel. They are responsible for working with undercovers on a daily basis. Information about these individuals is not available even to NYPD personnel in Department databases. The assignment of an officer as a handler for an NYPD undercover could lead to the disclosure of an undercover's identity as meetings between a handler and undercover sometimes must occur in public places. Revealing the name of the handler reveals their confidential assignment and could lead to identity of an undercover officer. Taken together with other documents, a person may learn the scope of the undercover program, including the number of officers engaged in undercover activities.

- **Date, time and location information** - Revealing this type of information has great potential for revealing the source of information. Because this information provides a clear indication of the undercover officer's physical presence at a particular place and at a specific point in time, others present at the same time could determine the identity of the

officer. Taken together with other documents a person may learn the scope of program activities, and number of undercover officers involved.

- **Description of activities** - Like date, time and place information, the descriptive details reported on will allow the person about whom the report is concerned or who may have been present during the activities reported on, to realize that someone present was an undercover police officer. With data from other sources and documents, a person may determine the identity of the undercover and the scope of all undercover work across the entire investigative program. Activities will also reflect the methods used by the undercovers and aspect of their tradecraft.

19.    In sum, the presence of a high level of detail in the raw, unevaluated field intelligence reports makes it possible to connect strands of information which in turn, provides a factual basis from which the identity of sources, methods and capabilities can be determined.

**F.    Reasons Documents Should Not Be Released**

20.    I emphasize that the release of the raw unevaluated field reports and other documents because they provide direct or indirect information on sources and methods would severely compromise the intelligence capabilities of the NYPD. Such a compromise would greatly undermine our ability to address the threats to New York City noted in the Appendix as well as those threats yet to surface. Indeed, based on my forty-one years experience as a career intelligence officer it is my strongest professional view that the damage to the NYPD intelligence program, a program that has become an essential element in the public security and safety of New York City in this post 11 September 2001 era, from the release of such material would be severe and irreversible.

21.    Contrary to the impression raised by the press, there was never an isolated "RNC Squad" whose work was separate and discrete from the rest of the Intelligence Division's information gathering mission. Indeed, most of the personnel, including undercover personnel, and all of the methodologies were, and are involved in all aspects of the Intelligence Division's information gathering and processing responsibilities. Consequently, sources and methods

damage resulting from the release of documents that I believe should be redacted or withheld, would impact on the entire intelligence program, not just a so-called "RNC Squad."

22.    The raw, unevaluated field intelligence reports co-mingle the substance of our information gathering effort with data that are both source and methods revealing. The raw, unevaluated field intelligence reports contain extremely detailed information about a particular activity including the geographic location, the premises, the time of meetings, numbers of persons present often identifying them by name, relationships between undercovers and confidential informants and other contacts they might have, as well as methods of communication and the means by which information is gathered. Any attempt to remove the sensitive information which provides a basis for determining sources and methods would be futile, resulting in pages of meaningless snippets of text and punctuation.

23.    The presence of the high level of detail in the raw, unevaluated field intelligence reports makes it possible to connect strands of information which in turn, provides a factual basis from which the identity of sources could be deduced and the Intelligence Division's methods of operation revealed. Open source information makes it clear that there are individuals and groups that would welcome the opportunity to connect the strands of information in the raw, unevaluated field intelligence reports. To confirm that fact one need only go to the website titled "whosarat.com" which bills itself as the largest online database of informants and agents.

24.    Open source information from the reports produced in the case and referred to in the Appendix gives an indication of how individuals and groups intent on violence and disorder, including terrorist operatives, would welcome the information contained in the raw, unevaluated field intelligence reports. For example, "Marking Law Enforcement" was the name given to a tactic posted on the Internet, Appendix at 16, which advocated the identification of suspected law

enforcement officers and uploading them to the Internet. It would not take much effort for someone engaged in "Marking Law Enforcement" or accumulating information for a database along the lines of "whosarat.com" to reap from the raw, unevaluated field intelligence reports, information which would create the immediate risk that undercovers and informants would be identified and posted on the internet. In addition, a roadmap of investigation decisions, techniques and information could be prepared that would enable the undermining of future investigations.

25.     Regarding release of our most sensitive material, we know that organizations and individuals that have considered operations against New York City, including terrorist operations, carefully watch what we do and what we say, for information regarding our capabilities, strategies and operational tactics. Release of our raw, unevaluated, field intelligence reports and other redacted material would provide them with unprecedented knowledge of how the Intelligence Division conducts investigations, including those involving undercovers and/or confidential informants. The doctrine of Al-Qaeda and its affiliates specifically calls for such exploitation. We have witnessed it in the Al-Hindi case, Appendix at 2, and in debriefings of other terrorist operatives. Anarchists and groups sponsoring illegal civil disobedience are also known to observe our strategies and tactics with an eye towards developing counter-measures.

26.     In addition to providing valuable information about intelligence operations to potential lawbreakers that would help them avoid detection, arrest and prosecution, the disclosure of sources will have consequences for the operation of the Division as a whole since it would debilitate our undercover and other essential programs. First and foremost, because if potential undercover officers come to believe that information from which their identity and status as undercovers could be derived may be disseminated in civil litigation, confidence in the

ability of the NYPD to protect them would be damaged and recruitment and retention would become extremely difficult. Our confidential informant cadre would respond similarly and, as noted earlier, our relationships with other international, federal, or other law enforcement and intelligence organizations would be tainted by our inability to protect documents that should not be released due to sources and methods reasons.

27.    Events over the past few years have demonstrated the importance of intelligence to effective policing with respect to both civil disorder and terrorism. Civil disorder in major cities in the United States and abroad has occurred when law enforcement failed to develop information with which to plan effective security strategies. As a result, the normal functioning of those cities was interrupted and the opportunity for meaningful protest undermined. Appendix at 8-10. As demonstrated by events occurring right now at the G8 Conference in northern Germany, the risk that protest activity may degenerate into violence is a continuing one. See Exhibit B hereto.

28.    Responsible law enforcement officials cannot ignore this history of disorder. To prevent it, it is crucial to develop reliable information about plans of those intending to engage in unlawful conduct. As the end-user reports provided in this case illustrate, many groups openly announced their plans to do just that during the RNC.

29.    It is safe to assume that there will continue to be large scale events and political demonstrations in New York which will present a risk of serious disorder. The need to police those events will require the development of information similar to what was developed in preparation for the RNC. The personnel, resources and tactics of the Intelligence Division will again be called upon to develop the needed information about any group stating its intention to engage in unlawful activity. Based on past experience, many of these will be the same groups

that threatened to do so during the RNC. The disclosure of the raw, unevaluated, field intelligence reports would make it impossible to conduct effective investigations on such groups in the future.

**G.    Conclusion**

30.    In conclusion, I wish to state that it is my belief that releasing the raw unevaluated field intelligence reports and the redacted materials in other documents would cause certain and irreversible damage to the NYPD intelligence program, and, in turn, the NYPD's ability to defend New York City from another terrorist attack and other threats to the  security and safety of the public.

Dated: New York, New York
       June 6, 2007

_____
David Cohen
Deputy Commissioner for Intelligence

# EXHIBIT A

## The Republican National Convention

### The NYPD Intelligence Program

The NYPD Intelligence Division in its current configuration was begun in early 2002 as part of Commissioner Kelly's plan to create a strong program to protect New York City, its citizens and visitors from another terrorist attack. The attacks on the World Trade Center in 1993 and September 11, 2001 brought home the reality of terrorism and the fact that New York City had been, and remains, a terrorist target. This finding has been consistently reinforced to us by those in the U.S. intelligence community responsible for assessing the threat to the homeland.

The on-going and continuous threat to the City is underscored by a long series of events that make clear that New York City, its citizens and visitors warrant an NYPD intelligence capability that helps protect against this persistent threat. The following events give credence to the need for a vibrant intelligence program that uniquely addresses the counter terrorism security equities of New York City. Each of them inextricably link New York City and terrorism in the post- September 11 period.

      a. The Media Anthrax Case: October 2001 ---In the space of a week, employees and visitors of the New York Post, NBC, CBS and ABC News in New York City were victim to anthrax attacks. A woman at another Manhattan location died of inhalation anthrax through cross contamination of the mail.

      b. The Iyman Faris case: late 2002/early 2003 ---Al Qaeda operative Iyman Faris, on orders from Khalid Sheik Mohammed (mastermind behind September 11, 2001), twice examined the Brooklyn Bridge to evaluate the feasibility of destroying it. Deterred in part the NYPD's high visibility policing, Faris reported that the "weather is too hot," meaning security was too tight to carry out the attack. He is serving 20 years in prison for conspiring against targets including the Brooklyn Bridge

      c. The Subway Cyanide Plot: February 2003 ---An arrest of a jihadist in Saudi Arabia revealed computer records of a plot to attack the New York City subway system using hydrogen cyanide in dispersal canisters. Surveillance of the subway stations had previously been undertaken.

      d. Iranian Agent Reconnaissance: 2003-2004 ---On three occasions security personnel from Iran's Mission conducted surveillance of New York City landmarks and infrastructure including bridges and the subway system leading into Manhattan. The U.S. Government and the NYPD are concerned that they were building "off the shelf" reconnaissance of New York targets in advance of any future attacks against New York by terrorists supported by Iran, such as Hezbollah. This would replicate Iranian action prior to the 1994 bombing of the Jewish center in Buenos Aires where 85 persons were killed.

e. The Mohammed Babar Case: April 2004 ---An Al Qaeda operative was arrested by NYPD detectives and FBI agents in Queens, New York for his role in a plot to bomb pubs, restaurants, and train stations in London. He had been a member of a radical organization which still exists in the New York City area.

f. The Citigroup/Stock Exchange Case: July 2004 ---A laptop computer of an Al Qaeda operative is recovered containing detailed reconnaissance plans ---a prerequisite for attack--- of the New York Stock Exchange and Citigroup headquarters in mid-town Manhattan. Dhiren Barot, aka Aba Esi al-Hindi was convicted Nov. 7, 2006 in London and sentenced to life in prison for his role in plotting the destruction of London hotels, in addition to New York financial institutions.

g. The Herald Square Case: August 2004 ---Shahawar Matin Siraj and James Elshafay were arrested for plotting to bomb the 34th Street and Sixth Avenue Subway station, located just a block away from Madison Square Garden, where the 2004 Republican National Convention was to be held.

h. The Uzair Paracha Case: November 2005 ---Uzair Paracha, a Pakistani-born resident of New York City, was convicted of providing material support to Al Qaeda. Paracha's father, who knew Bin Laden, was part owner in a Manhattan garment district business. It is believed that Paracha's ultimate goal was to use that business's shipping containers to smuggle weapons or explosives into New York City.

i. The Tariq Shah Case: May 2006 ---Tariq Shah, a Bronx resident and martial arts expert, was indicted for providing material support to Al Qaeda. Shah had conspired to provide martial arts and hand-to-hand combat with weapons training to Al Qaeda.

j. The Syed Hashmi Case: June 2006 ---Syed Hashmi, a Queens resident active in the New York City chapter of a radical Islamic group known as al-Mujairoun, was arrested in London where he was engaged in providing material support for Al Qaeda fighters in Afghanistan; another member of the group was deported after being identified as the source of a suicide bomb threat.

k. Path/Ground Zero Case: July 2006 ---Lebanon authorities arrested a principal in a plot to attack the PATH subway linking New Jersey to Lower Manhattan and to blow up the retaining wall at Ground Zero at the former World Trade Center site in an effort to flood lower Manhattan.

With this operational environment in mind, the NYPD leadership has taken steps to assure that New York City's post-September 11, 2001 counter terrorism and security interests were pursued thoughtfully and aggressively. Most important, it has been a well informed program thanks in large measure to its intelligence investigative, information gathering and analysis efforts. Measurements of effectiveness and impact in these regards include the following:

2

- <u>First,</u> the NYPD intelligence activities were directly responsible for thwarting at least one major terrorist plot ---the Herald Square Subway plot. A Federal judge sentenced the main Herald Square Plot perpetrator to 30 years in prison following his conviction by a jury consisting of New York City citizens.

- <u>Second,</u> the Intelligence Division's ability to collect and analyze timely intelligence has become a vital ingredient in all aspects of the NYPD counter terrorism program ---a program that has been referred to by the Secretary of Homeland Security as a model for the country. The following is a sampling of how such intelligence is employed against the terrorist target.

    o  <u>Operation Hercules</u> ---teams of heavily armed NYPD personnel deployed daily to locations identified on the basis of intelligence obtained locally, nationally and internationally.

    o  <u>The Critical Response Vehicle [CRV] Surge</u> --- these operations are similarly directed on a daily or twice daily timeline to locations that intelligence collection and analysis determines are of highest terrorist priority.

    o  <u>Operation NEXUS</u> ---direct NYPD interaction with individual business persons or organizations whose products or other resources, according to our intelligence collection and analysis findings, would be of value to a potential terrorist attack plan.

    o  <u>The NYPD Transit Baggage Inspection Program</u> --- as with Hercules and the CRV surge, this activity is given guidance from our intelligence collection and analysis activities, which help determine where and when container inspection is most needed.

    o  In addition to these and other activities, the more than 25,000 counter terrorism NYC Safe Hotline call-ins since 2002 constitute the largest intelligence-led follow-up response activity in the United States or elsewhere.

- <u>Third,</u> the professionalism and capability of the NYPD's intelligence gathering, investigative and analysis program is given testimony by the fact that it has achieved strong standing and a strong voice within all elements of the U.S. national intelligence community. This standing is

3

an important component of New York City's post-September 11, 2001 security because it helps insure needed access to national level intelligence while simultaneously assuring that New York City's vital counter terrorism interests and equities are given proper priority by the intelligence community at large.

- Fourth, the performance and the performance standards that Commissioner Kelly has established for the intelligence program have given it a global reputation that is recognized not only by law enforcement and security services around the world, but no doubt by terrorist organizations and groups as well.

  o It is this reputation that, for example, underpinned the willingness of Spanish officials to welcome an NYPD presence in Madrid within hours of the March 11, 2004 Madrid train bombing; the NYPD was the only foreign law enforcement agency on-site and the information gathered helped strengthen our own subway security real-time as the Madrid investigation unfolded.

  o Regarding the terrorist enemy, the global reputation of the NYPD, strengthened by its intelligence gathering and analysis program, is known to terrorist groups and contributes significantly to their recognition that New York City is no longer a "soft target" as it was on September 11, 2001.

## Governance of Intelligence

While operating to pre-empt acts of terror or other acts of violence against our citizens and visitors, it is the unbending policy of the New York City Police Department that information- gathering by its Intelligence Division conform to the guarantees of the Constitution and requirements imposed by law or NYPD's Patrol Guide, that care be exercised in the conduct of that activity so as to protect Constitutional rights and that matters investigated are confined to those supported by legitimate law enforcement purposes. These core principles have been at the foundation of the NYPD Intelligence program since its post-September 11, 2001 reconfiguration.

With these core principles always in mind, the Intelligence Division is authorized to do the following:

4

- In order to develop information to detect or prevent acts of terrorism or other unlawful activity, the Intelligence Division conducts online searches and accesses online sites and forums on the same terms and conditions as members of the public generally do.

- If these efforts lead to information that an individual or group has advocated the commission of violence or other unlawful acts, the NYPD has the authority and responsibility to determine whether the individual or group has the apparent ability or intent to carry out the advocated unlawful act.

- The authorized and required tools used to make such determinations include the use of specially trained undercover personnel and/or confidential informants; in these cases only after the approval of an appropriate senior officer of the Intelligence Division.

  o All such approvals must be made at the highest civilian level ---the Deputy Commissioner of Intelligence.

Cognizant of the principles it abides by, the NYPD Intelligence leadership carefully and consistently reviews its program activities and assures that all personnel are specifically trained to understand the legal authority and limitations under which they operate. The training is continuous so that new personnel, including supervisors, are properly informed. A senior legal advisor with significant experience in civil rights matters reports directly to the Deputy Commissioner for Intelligence, oversees the above-noted training and consistently reviews program development and activities to assure compliance with legal requirements and limitations.

## The Republican National Convention Context

The central responsibilities of the NYPD prior to and during the Republican National Convention were carried out in a context of intense and well-founded concern regarding:

- First, the possibility of a terrorist attack in New York City at the time of the convention.

- Second, unambiguous threats of violence by anarchists and others with a history of carrying out such threats in previous major city protests.

- Third, a nationwide call for lawful/unlawful civil disobedience with the stated aim of disrupting the Republican National Convention and New York City.

5

In this environment, NYPD organizational obligations were to fulfill these three essential missions:

- First, to protect the life and property of New York City citizens, guests, and visitors, including the approximately 800,000 persons who came to exercise their legitimate right to protest without breaking the law.

- Second, to assure a public security environment necessary for the continuance of the normal business activity of New York, including that of City government as well as private sector enterprises and their employees who needed to travel to and from work.

- Third, to assure a public security environment that would permit the normal business of the United States Government to be carried out without disruption…in this case the nomination of a presidential candidate.

In meeting these responsibilities it should be noted that in the March 25, 2007 issue of the New York Times the NYPD was said to have engaged in "political surveillance" and used an "RNC squad" to accomplish this. Both statements by the New York Times are at worst a fabrication or at best a distortion of the information gathering process the Intelligence Division used to identify and judge the threat of anarchist violence or acts of civil disruption intended or planned for the RNC.

## The Terrorist Threat Environment

An approximately eighteen month period elapsed between the February 2003 announcement that New York City would host the Republican National Convention and the actual August 29 – September 2, 2004 convention. By any measure, this was the most intense 18 month threat period of the post September 11, 2001 era to date. NYPD Republican National Convention planning was driven in great measure by the knowledge that New York City was and would remain the prime target of international terrorist organizations, U.S.-based homegrown terrorists or some combination of the two.

As the following partial chronology demonstrates, the global and terrorist environment became even more threatening as the start of the convention neared. Because of the terrorist penchant for simultaneous attacks and given the priority they place on New York City as a target, an attack in any major location around the world demands that the NYPD is on immediate heightened alert. The severity of the 2004 environment was such that the U.S. Government summed the threat environment up as "The election year threat."

- May 2003 ---In Casablanca, Morocco, five near-simultaneous bomb attacks occurred killing 33 and wounding 101 persons. Jewish targets were clearly a priority.

6

- <u>August 2003</u> ---In Jakarta, Indonesia, a car bomb exploded in the front of the Marriott Hotel during lunchtime rush hour, killing 12 and wounding 149. Concerned about possible simultaneous attacks, NYPD counter terrorism hotel coverage was sharply increased.

- <u>November 15, 2003</u> ---In Istanbul, Turkey, 2 vehicle bombs exploded at two separate Istanbul synagogues killing 20 and wounding 300. The simultaneous nature of the attacks and the clearly Jewish target reverberated sharply in New York City. NYPD Intelligence personnel were deployed to Turkey and extra protective details were placed at New York City synagogues.

- <u>November 20, 2003</u> ---In Istanbul, Turkey, a vehicle loaded with explosives exploded in front of the British Consulate, killing 30 people, including the Consul General, and wounding 450 others. On the same day in Istanbul, another vehicle bomb detonated outside an HSBC Bank, killing 11 people and wounding 105; in 2005 the British Consulate building in New York City suffered a grenade attack.

- <u>December 2003</u> ---Hassan Nasrallah, the Lebanese leader of Hezbollah, again raised a concern that Jewish interests anywhere in the world might be legitimate Hezbollah targets. Because New York City is home to the world's largest Jewish population outside of Israel, this concern struck a loud chord in the NYPD thinking.

- <u>February 2004</u> ---The Moscow, Russia subway was attacked by a suicide bomber.  Coming on the heels of the New York Subway cyanide plot noted earlier, this event reinforced our already deep concern regarding attacks on our transit system.

- <u>March 2004</u> ---The Madrid, Spain commuter train attack killing 197 persons was interpreted by many as a punishment for Spain's alliance with the United States in Iraq; already a primary terrorist target, hosting the Republican National Convention further underscored the value of New York City as a terrorist target.

- <u>April 2004</u> ---The initial U.S. Government identification of the period ahead as "the election year threat" period, a phrase coined in part due to the effect of the Madrid bombing the previous month, but also on streams of reporting that strongly suggested planning for attacks in the homeland.

- <u>Late July 2004</u> ---The capture of the Al-Qaeda operator Issa Al-Hindi together with detailed surveillance assessments of the New York Stock Exchange and the Citigroup Building in New York City, once again

highlighted New York City as a target. At the time there was no information regarding how advanced the planning was. The U.S. Government raised its National Threat Advisory level and the Republican National Convention was less than 30 days away.

- August 2004 ---The Herald Square subway plot is surfaced with the arrests of Shahawar Matin Siraj and James Elshafay. The homegrown terror plot centered on the 34th Street subway station at Sixth Avenue in Manhattan ---one city block away from Madison Square Garden, the location of the Republican National Convention itself. As noted earlier, the two perpetrators were tried and convicted in a Federal Court and sentenced to 30 years and 5 years respectively.

**Major City Protest History**

A second factor influencing NYPD preparation for the Republican National Convention was the record of major city protest activity during the period from 1999 onward. With few exceptions, this history is one of extreme violence, vandalism and unlawfulness that substantially impeded the normal functioning of the host city and undermined the opportunity for lawful protests to proceed. In all instances, it appears that inadequate advance understanding or knowledge of the plans and intentions of those prepared to commit violence, vandalism and unlawful actions undermined the ability of law enforcement personnel to properly contain the disruption.

The NYPD was obligated to not let this major city protest history be repeated in New York City. The following is a summary of recent major city protest history. Among other things, it demonstrates three key lessons ---first, the ability of anarchist elements to actually do what they say they want to do, if allowed; second, that unlawful civil disobedience can result in severe mayhem if not properly responded to by law enforcement personnel; third, the critical importance of having an informed law enforcement leadership in order to assure that it neither under or over reacts to protest events.

- Seattle, Washington – November 30-December 3,1999, in an event involving 50,000-100,000 protestors, often referred to as "the Battle of Seattle," extremist elements overwhelmed law enforcement, and were successful in causing the cancellation and delaying of scheduled events by means of chaining themselves together in roadways. In addition activists committed related acts of vandalism, violence, and property destruction including setting fires, overturning police and emergency vehicles, and vandalizing and looting local businesses. This may have occurred because law enforcement either ignored or did not know of the plans and intentions of those willing to protest in violent and illegal ways.

8

Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **extremely high.**

- Davos, Switzerland – January 29-February 1, 2000, an estimated 1,300 persons participated in protests against the World Economic Forum. Billboards were set on fire and destroyed, a McDonalds Restaurant was vandalized with graffiti and its signs and windows destroyed. Protestors also removed barriers, ripped down flags, destroyed storefront windows, and vandalized vehicles.

Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **very high.**

- Quebec City, Canada – April 20-22, 2001, an estimated 20,000 activists protested against the Free Trade Area of the America's summit. The protests turned violent on the opening day when extremists took control of the streets in and around the summit and tore down a 13 foot high fence and cement barrier delaying the event. This group involved persons wearing ski and gas masks who were throwing projectiles and Molotov cocktails; the results included fires, broken store windows and vandalized vehicles. Anarchists arrested prior to the event were in possession of gas masks, bullet proof vests, shields, chains, hammers, helmets and explosives. In summary, law enforcement agencies underestimated the propensity for violence, consequently, police strategies and tactics fell short of what was needed to preempt what became serious civil disorder.

Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **extremely high.**

- Genoa, Italy – July 18-22, 2001, an estimated 200,000 persons participated in protests against the G8 summit. This summit was quickly overshadowed by riots; one person was killed when he was about to throw a fire extinguisher into a police vehicle surrounded by a crowd of protestors armed with metal poles and wooden boards. In the riots, persons wearing black and red anarchist-style clothing, gas masks, helmets, body armor and carrying large plastic shields vandalized businesses, set fires, tore down fencing, and surrounded and took possession of police vehicles. There were 500 persons injured and an estimated 45 million dollars in property damage. Neither law enforcement nor event managers were prepared for what happened.

9

Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **extremely high.**

- San Francisco, California- March 2003, several thousand people participated in an anti-war protest in which protestors shut down more than 40 intersections throughout San Francisco. The protestors unlawfully sat in the intersections blocking traffic either arm and arm or chained together in addition to blocking an entrance to a federal building, keeping employees from entering. Protestors regrouped throughout the day and during the evening rush hour marched through the financial district and attempted to take the Bay Bridge. The city was forced to reroute busses, and shut the historic F-line trolleys. In addition protestors shot bolts from slingshots at police, and vandalized police vehicles. Law enforcement either did not know of the plans and intentions, specifically the willingness of protest elements to commit unlawful civil disorder, or did know of it but were unable to prepare a corresponding deterrence.

Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **extremely high.**

- Cancun, Mexico – September 2003, several thousand people participated in protests against a World Trade Organization conference. Protestors clashed with police while trying to break through 8 foot high security fences to storm a strip of beach hotels and fast food restaurants. Police were forced to use tear gas against the protestors who were attacking them with sticks, metal bars, and stones. A South Korean farmer climbed a security fence and committed suicide by stabbing himself in the chest.

Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **very high.**

- Miami, Florida – November 2003, an estimated 20,000 people participated in protests against the Free Trade Area of the Americas meeting. Extremists engaged in violent clashes with the police, set fire to trash cans, used wooden pallets as shields, were in possession of ski and gas masks and were throwing tear gas canisters back at the police. In addition, anarchist groups infiltrated legitimate demonstrations and threw rocks and chemical paint like substances at law enforcement personnel. There were approximately 250 arrests made.

10

> Finding: The ratio of violence and civil disorder to law abiding protestor crowd size was **extremely high.**

- Boston, Massachusetts – July 2004, in preparation for the Democratic National Convention, Boston officials closed major transportation hubs, parts of a major interstate highway and streets in and around the convention site, while also advocating that local businesses in the area of the convention be closed or relocated. Although there was some protest activity, it was minimal.

> Finding: With minimal protest crowd size and the city virtually put off limits even to normal business activity, the level of violence and civil disorder was accordingly **minimal**.

## The Republican National Convention Record

Beyond the matter of seeking to forestall a possible terrorist attack, as confirmed by open source information, the NYPD knew the following regarding what was planned or intended regarding the Republican National Convention:

- First, That certain individuals and groups intended to shut down portions of the City with acts of violence if necessary, as they had in previously mentioned city protests ---those were the anarchists.

- Second, Yet another and larger group of people intended to commit acts of unlawful civil disobedience to disrupt the normal business for the City and the Convention process ---while not comfortable committing violence they were prepared to act illegally.

- Third, Embedded in both these groups were individuals with criminal histories and a past demonstrated indifference to the impact of their actions on the third category of people ---the 800,000 protestors who wanted an opportunity to lawfully express their views during the Republican National Convention.

- Fourth, Among the criminal element there was a modus operandi of hiding or altering their identity with an eye toward disrupting the arrest process; in this regard they would be indistinguishable from any terrorist operators who might have been in play during the RNC period.

Any review of open source information during the 18 months leading up to the Republican National Convention would lead to the conclusion that anarchists and others

11

from across the country wanted to take action to disrupt the RNC and New York City. Initially these plans and intentions were unsynchronized and emanated from a disparate array of individuals, individuals with followers and actual organizations. NYPD information-gathering was focused exclusively on determining who those persons and/or groups were and what they intended to do; NYPD was totally indifferent to their political views. In any event, by July 2004 ---8 weeks before the RNC--- there emerged an as yet unidentified organizing force that had the effect of focusing these disparate plans, proposals and intentions so as to give them direction and force. As an example of the above, a specific date for creating civil disorder was chosen ---referred to "A-31" or "The Day of Chaos"--- Tuesday, August 31, 2004.

### Republican National Convention Targets

Beyond this "Day of Chaos," there emerged a pattern of targets that were chosen by anarchists, groups of anarchists and others intending to break the law. These targets which are discussed below were identified in open on-line advisories, open forums available to anyone interested in attending, and in posters, press releases and internet postings.

- Madison Square Garden (MSG): For many this was considered "ground zero" since it was hosting the national RNC proceedings. Recognizing that gaining direct access would be difficult the focus quickly shifted to preventing access, although some elements were determined to achieve entrance into the convention proceedings with false identification; some suggested "swarming" from the subway system below Madison Square Garden via Pennsylvania Station.

- RNC delegate routes to MSG (private and public transportation): Early anti-RNC thinking focused on the goal of preventing delegate access to Madison Square Garden became a high priority. This included interfering with planned bus travel to and from Madison Square Garden by delegates. At one point, one bus filled with delegates was diverted due to illegal "swarming" of the bus. Other actions talked about included actual disruptions of the buses themselves by blinding bus driver windows, using vehicles (rented cabs/bikes) to clog the routes.

- Hotels hosting RNC events and persons (delegations in parentheses): NYPD coverage at these hotels prevented the kind of "hotel rushing" tactics talked about, although in several cases entrance was achieved by persons seeking to disrupt normal hotel business.
  - Algonquin Hotel (District of Columbia)
  - Barclay Hotel (New Hampshire)
  - Crown Plaza Hotel (New Jersey)
  - Drake Hotel (Massachusetts)
  - Embassy Suites (American Samoa and Indiana)

12

- Helmsley Park Lane (Louisiana, South Carolina, and Vermont)
- Hilton New York (Florida, Michigan, Pennsylvania and Texas)
- Hilton Times Square (Mississippi and Vermont)
- Marriott East Side Hotel (Colorado and Minnesota)
- Marriott Financial Center (Guam, Hawaii, Nebraska and North Dakota)
- Millennium Broadway (Washington, West Virginia and Wisconsin)
- Millennium Hilton (Delaware, Puerto Rico, Rhode Island and Utah)
- New York Marriott Marquis (California, Ohio and Tennessee)
- Park Central Hotel  (Idaho, Kansas and Maryland)
- Renaissance Hotel (Montana)
- Rihga Royal Hotel (Nevada)
- Ritz-Carlton Hotel (Georgia)
- Roosevelt Hotel (Arizona, New Mexico, Oklahoma and Oregon)
- Sheraton Manhattan Hotel (Alaska, Iowa, South Dakota and the Virgin Islands)
- Sheraton New York Hotel (Alabama, New York, Connecticut and Wyoming)
- Warwick Hotel (North Carolina)
- West New York Hotel (Arkansas and Maine)
- Westin Hotel (Kentucky and Missouri)

- Broadway theaters: Activists were solicited to disrupt performances attended by RNC delegates.  Lists of which delegates would be attending which performances at which theaters were circulated along with theater maps.  This activity was especially planned for August 31, 2004 and referred to beginning in July 2004 as "Chaos on Broadway."

- Wall Street/Financial District: Targeted for multiple "direct actions" including massive traffic disruptions in order to "lock down" the area. Discussions of this target area began in the spring of 2004; the goal was to prevent the normal functioning of the New York City financial community.

- RNC event locations (with target groups in parentheses):
  - BB Kings (Texas Delegation)
  - Carmines (Keep Our Mission PAC / Speaker Dennis Hastert)

- Central Park Boathouse (National Republican Senatorial Committee)
- Crobar (American Gas Association)
- GOP golf outing
- Gotham Hall (Generation of Leaders)
- Madame Tussaud (New York Delegation)
- Noche (Ohio Delegation)
- Planet Hollywood (Republican Governor Association)
- Rainbow Room (members of the entertainment industry)
- Ruby Foo's (Kentucky Delegation)
- Sotheby's (Regents and Rangers lunch)
- Tavern on the Green (Swift Boat Veterans for Truth)
- Tunnel (Union Pacific)
- Water Club (Novartis)

- <u>Businesses and Organizations</u>: The following businesses were identified in various fora as enterprises that should be subject to disruption because of their involvement in activities opposed to by individuals or groups. The nature of the disruption was uncertain although in previous protest activities outside New York City they involved efforts ranging from blocking entrances to window breaking and fire setting.
  - McDonalds
  - Starbucks
  - Carlyle Group
  - Chevron
  - Rand Corporation
  - Hummer of Manhattan.

- <u>Police</u>: Activists distributed information concerning police tactics and the whereabouts of police precincts and headquarters and advocated: (1) studying police behavior prior to the RNC to become familiar with their tactics in handling protest activity; (2) obstructing police from entering crowds and attempting to prevent arrests; (3) "rushing" the police at Madison Square Garden; (4) identifying and publishing the identities of undercover officers on the internet; (5) "marking" police with paintball bullets to make them easier for protestors to spot; and (6) videotaping arrests to collect evidence of any alleged mistreatment of protestors. One report was received of an out-of-state individual saying he wanted to "get a New York City pig", by which was clearly meant an NYPD officer.

## Republican National Convention Tactics

14

During the lead-up to the RNC, anarchist groups, groups advocating illegal and violent civil disobedience, and other activists engaged in extensive discussions over the internet and in other open forums of tactics that could be used to protest the RNC. Many of these tactics had been used to undermine public safety and order at meetings of the WTO, G-8 and FTAA respectively in Seattle, Genoa, and Miami, while others were introduced specifically to target the critical infrastructure of New York City. These tactics included, but were not limited to, the following:

- Black Bloc—Groups of protestors typically wearing black and with black face paint armed with homemade weapons capable of launching projectiles dangerous to persons and property. Black Bloc tactics were relied upon heavily by protestors during the "Battle of Seattle."

- Shield Walls—Marchers armed with shields moving with arms linked to create a defensive wall and penetrate a perimeter line.

- Human Chains and Improvised Barricades—Groups of protestors interlocking legs, arms and bodies to obstruct traffic or form barricades to force back or break through police defensive lines.

- Critical Mass—The obstruction of public thoroughfares and transportation systems by groups of protestors traveling in packs on bicycles or on foot, often erecting improvised barricades to fend off police.

- Swarming—Rapid convergence of a large group of people onto a single location.

- Die-ins—Groups of activists laying motionless on the ground and refusing to disperse, often in the middle of an intersection, to obstruct traffic.

- Step off the Pavement—Pedestrian interference with automobile traffic to achieve traffic jams across the City. Its effects were likened to those of the August 2003 blackout.

- False/Stolen IDs—Utilizing false or stolen press credentials, business cards, and government badges in order to circumvent security and gain access to off-limit areas of the RNC.

- Securing hotel rooms inside hotels used by delegates and reporting electronic keys lost in order to obtain additional keys and bypass security.

15

- Auto Brigade—Using private automobiles to block the roadways at specific locations, directing multiple cabs simultaneously to the same destination to disrupt traffic and clog vehicular arteries.

- Marking Law Enforcement —Photographing suspected law enforcement officers and uploading them to the Internet prior to protest activities; shooting officers with paint bullets, then disseminating their location and identity.

- Thinning Out —Overwhelming police units by holding simultaneous protests at multiple far-flung locations.

- False 911 Calls/Bomb Threats/Fire Alarms—Aimed at draining law enforcement resources, disrupting events and overwhelming communication systems by telephoning false reports of major incidents in areas of NYC distant from the zones of planned Direct Actions.

- Electronic Civil Disobedience—Flooding telephones, email inboxes, or fax machines in order to cause system failure, defacing websites and spreading computer viruses, disrupting law enforcement communications with cell phone transmission jammers.

- Electricity Disruption—Created by launching Mylar helium balloons filled with metal shavings toward electrical power lines.

- Extinguishing the engines on chartered shuttle buses by flipping kill switches near the rear engine compartment located behind an unlocked panel.

- Phantom Volunteering—Activists posing as RNC volunteers and attending training/orientation sessions for the purposes of gaining access to information.

### Republican National Convention Weapons

The following list, compiled from discussions on web-forums and blogs as well as in various open-source publications, includes weapons whose use at the RNC was advocated by anarchists or other activist groups, promoted during RNC protest training sessions, and/or field-tested during violent protests in other cities.

- Ammonium nitrate bombs strapped with nails

- Molotov cocktails

- Smoke bombs

16

- "Firebombs" of Molotov cocktails or chains wrapped in kerosene-soaked rags launched with projectiles

- Toxic and Flammable Liquids—Including ammonia, bleach, battery acid, hydrofluoric acid, gasoline, paint, and magnesium dispensed with the use of super-soakers, spray and squirt bottles, canteens, hollowed eggs and balloons.

- Human body fluids—Including blood, urine and feces.

- Projectile Launches—Including rocks, paving stones, bottles, batteries, ball bearings, nuts and bolts, billiard and golf balls, hockey pucks, nail-filled potatoes, live CS canisters, frozen water balloons, all of which could be catapulted with wrist rockets, slingshots, large rubber bands, paint ball guns, or lacrosse sticks

- Grappling hooks, sledgehammers and crowbars, employed to bring down security fences

- Sleeping Dragons—Devices in which multiple activists lock hands mechanically so that they can form inseparable human chains

- Tiki Torch—A soup can attached to the end of a stick held in an upward position and filled with a flammable substance, which is then ignited and launched as a projectile

- Super-Soakers— Water guns filled with flammable liquids, chemical irritants, homemade pepper spray, urine, or paint

- Oil, marbles, and ball bearings spread on roadways and used to cause responding foot, motorcycle, and Mounted Units to lose footing and fall

- Rolling Barrels—Filling drums with water or cement then rolling them into police lines to slow response time

- Mobile Infrared Transmitters—Portable traffic signal changing devices that can change traffic signals within two to three seconds, with a range of 15—1800 feet

- Bureau of Inverse Technology (BIT) Radio—Enables user to take over and control a commercial FM radio broadcast for a brief (1-10 second) interval during which the operator may broadcast any message

**Republican National Convention Training**

17

During the months and days prior to the RNC, anarchists and activists convened a number of protestor training sessions in and outside of New York City, some of which were led by well-known and experienced activists. At these training sessions, violent and other illegal tactics were advocated and taught, as well as techniques for evading or countering law enforcement intervention. These training sessions contributed meaningfully to the threat posed to New York City.

- New York City Anarchist Tribes— January 11, 2004 martial arts training for activists at the World Martial Arts Center, 427 Broadway, New York, NY.

- Syracuse Peace Council (SPC)—April 2004 week-long Direct Action training weekend in Ithaca, NY, promoted as the path to "build[ing] our own radical activist infrastructure."

- Times-Up Strategic Retreat— July 23-25, 2004, weekend training in "anti-oppression," cyber activism, bicycle techniques, street tactics, and protest communications at a 300 acre farm in Rosendale, NY.

- A-31 Action Coalition training session for a "Day of Direct Action"— July 20, 2004.

- Ruckus Society and the Center for Anti-Violence Education (CAVE) – July 31 – August 1, 2004,  August 5-6, 2004, Direct Action training session focusing on self-defense and civil disobedience tactics in Park Slope and Manhattan.

- Burdock 2004 — August 10-17, 2004, activist training camp focusing on Direct Action training and strategies in Starks, Maine.

- Pagan Cluster/RANT Collective Training— August 31, 2004 Direct Action training session at St. Mark's Church in Manhattan, hosted by prominent activists.

## Republican National Convention Open Source Threat Review

As noted above, the information covers a wide range of threat-related activity including targets, tactics, weapons and training. What follows are excerpts from and descriptions of the various websites, chat-rooms, and other forums in which the planning for various violent or illegal civil disobedience activity was undertaken. Also included is a selection of notable threat-related incidents that highlight the complex and dynamic operational environment in which the planning for the RNC and the convention itself took place.

- Excerpts from the Anarchist Checklist for Action:

  o "Employ means to estimate and counter police activities. Don't carry your identification or address book. Have a plan to go to the hospital (fake name and SS# are needed)."

  o "If police enter the crowd, obstruct their path, prevent arrests, making it seem accidental. If you find your group surrounded by police, decide where their line is thin and then, in a tight formation (link arms), charge that point in an attempt to divide the police line."

  o "Stay aware of those around you. Undercover agents may be easy to identify (pairs of big men with two day beards, nice watches and communication equipment)."

  o "As the Black Bloc action unfolds be aware that escape is the conclusion of a successful action. Don't get caught. Use the confusion of the crowd to your advantage. Once you're out of your Black Bloc clothing, the subway or a taxi can easily be your vehicle to freedom in order to fight for another day."

  o "The ideas you come up with may be used for the next blow we strike against capitalism. 'Make the next blow a killing one.'"

- C.R.E.S.T. "Constitutional Rights Enforcement and Support Team" internet-based group stated:

  o "The C.R.E.S.T. will rise up against police brutality and give the police or the National Guard a taste of their own medicine if they tread on the civilian population, and they will be given the same measure that they dish out."

  o "Many people who join this group will die, be wounded or jailed."

  o "Some of you may be forced to shoot some constitutional rights usurpers who were 'just doing their job' and some of them will have families."

  o "The team will be on stand-by at every protest and will defend protestors against police brutality whether or not they are C.R.E.S.T. members."

- Ashira Affinity, a Colorado-based anarchist group, issued on its website a call to its supporters to join in protest at the RNC, stating:

  o "In our actions we must be strategic, ruthless, efficient, as well as chaotic. Like a string of tornadoes and quakes, we will manifest brutal attacks against key targets physically deconstructing the aesthetic of our oppression. We will erect barricades of fire and reclaim space as carnival. Our rage as well as joy will be present on every street corner."

- Excerpts from an online "Action tip" list for activists:

  o "Pick one (hotel) office or one (hotel) phone number and stick to it."

  o "Use a payphone especially for the 1-800 calls as they have to pay for it."

  o "If you can afford to buy a phone card go after the lesser called local #s."

  o "Let the perverts call the perverts [sic] advertise these numbers everywhere [sic] sex hotlines."

- "Syracuse Peace Council (SPC)" promoted an intensive Direct Action training weekend in Ithaca NY online, stating that:

  o "Even those not engaging in non-violent acts of civil disobedience should have trained accordingly to know how to respond to unpredictable events."

- "Surveillance Camera Players" (SCP), an anarchist group founded in 1996, operated a website (www.notbored.com) with a map detailing the locations of all identified surveillance equipment in the general vicinity of the RNC, including:
  - Private surveillance cameras: 217
  - Government surveillance cameras: 12
  - New York City or NYPD cameras: 5
  - Traffic surveillance cameras: 3
  - Elevated surveillance cameras: 2
  - Total number of cameras: 239

  o In one such tour, it was suggested by a group member that the wires necessary to operate a particular surveillance device were easily accessible and therefore vulnerable.

20

- Website containing a database of "Rangers and Pioneers" listed the names, occupations, employers, industry and sector of donors who have given $100,000 or more to President Bush's re-election campaign.

- "Direct Action Handbook" web page posted links to various activism-related topics, including organizing structures, information regarding the visiting delegates, including their temporary residences, hotels, and a list of "pro-war" companies, and methods to counter disorder control personnel, including:

  - Conducting surveillance of the target area
  - Wearing masks to conceal identity
  - Carrying banners/signs/placards constructed of plastic material for use as shields against "beanbags," "rubber pellets" or "baton charges"
  - Continual motion to evade interception by law enforcement
  - Counter-advancing police lines to open escape routes
  - "De-arresting" persons taken into custody by disorder control personnel by "immediately breaking the arrestee away from the police, and utilizing a block tactic (interlocking arms)" to prevent a re-arrest.
  - Utilization of "bicycle scouts" to perform advance reconnaissance of disorder control positions.

- Online "First Aid" manuals prepared readers to treat activists exposed to tear gas and pepper spray and injured by physical confrontation with disorder control personnel, suggesting that they bring/wear bandanas soaked with apple cider or vinegar, gas masks, shatter resistant eye protection, and multiple layers of clothing to help protect them.

- A group of self-described "Hacktivists" announced over the internet plans to launch an electronic "civil disobedience campaign" one week prior to the convention that would target the Republican Party, conservative think tanks, and corporate news vehicles with tactics including the diffusion of Internet viruses.

- "High Times" magazine published an "Activist Guide to the Republican National Convention" containing the following topics:

  - "How to Raise a Ruckus" (focusing on training by the Ruckus Society)

21

- o "How to Shoot a Video at a Protest"

- o "How to Take Over the Airwaves"

- o "How to Bike the RNC" suggesting riding in packs of 50 with continual motion, blocking traffic in intersections

- San Francisco Video Activist Network video of March 20, 2003 protest of the war in Iraq was posted online, displaying tactics including:

  - Bolts and screws thrown at police
  - Activists locked together with a "Sleeping Dragon"
  - Intersections shut down during rush hour
  - Mainstream media representatives assaulted
  - Spray painting of reporters' camera lenses
  - Black bloc anarchy tactics
  - Igniting hay placed in the roadway
  - Using dumpsters to form barricades
  - Shutting down highways with activists on bikes

- Postings from activist Ted Rall's website:

  - o "Next year in New York is already the rallying cry of more than one hundred and fifty groups planning to protest Bush's coronation."

  - o "It will be Chicago 1968."

  - o "Things are going to burn; people are going to die."

- "Secondary Protest Targeting," an anonymous Internet posting urged anarchists not to limit protests to the actual RNC delegation itself but to extend protest targeting to include any industry servicing delegates, including restaurants and Broadway theater companies:

  - o "You can harass the RNC convention planners, financial backers, volunteers, sponsors, restaurants feeding them and hotels housing them. The RNC is happening because local business elites have greased the wheels to get them here."

- "Crimethinc Black Hat Hacker's Bloc" organized an "electronic sit-in" of the RNC.

22

- Postings about "Chaos on Broadway," on August 29, 2004, urged participation in "swarming" Times Square and the Theater District to interfere with delegates attending Broadway shows.

- "Peoples' Guide to the Republican National Convention" included a street map of Manhattan, and more than 600 points of reference such as:

    o RNC venue and delegate hotel locations
    o Scheduled RNC protest locations
    o RNC corporate sponsors
    o Military and government offices
    o War profiteers
    o Police Precinct addresses (including One Police Plaza)

- Anonymous activist posted a claim that he successfully infiltrated the RNC volunteer workforce, calling him/herself a "shadow volunteer," who has been "involved in (protest) actions since 1993" and has "been arrested once for vandalism" while mocking the RNC "extensive background checks."

- NYC Indymedia promoted "2004 RNC Protestors Map" providing details about locations including:

    o Bloomberg's private residence
    o Scheduled anti-RNC protest activity
    o RNC delegate hotels
    o Broadway theaters that will be attended by the RNC delegation
    o Police Precincts
    o Activist friendly locations

- United for Peace and Justice circulated "A29 UFPJ Peace March," a schedule of Direct Action training sessions on the web, focusing on "Effective Action and Safety During the RNC, Protest Drumming Workshop, and I-Witness Mini Video Witness Training." The group stated of the decision to disallow mass protesting in Central Park:

    o "As their barricades and officers face south, in an attempt to hold back the masses, we will arrive from the north to reclaim our streets, and open the way towards Central Park."

- Internet chat room posted a threat stating "I will fly a 767 into the convention and take care of the American problem on Thursday,"

authored by a subject who had been posting anti-American government messages for about a month.

- www.counterconvention.org posted a listing for a "Protest Party" on Thursday, September 2, 2004, encouraging protestors to "Give them the New York they are afraid of!"

- An unnamed group claiming to represent commercial drivers and disgruntled motorists posted an internet announcement calling for protestors to "flood the streets" with commercial vehicles in order to disrupt traffic.

- Members of the 20th precinct arrest an individual in possession of terrorism-related literature, fictitious identification and various written, audio, video and photographic materials naming specific political and logistical targets for terrorist attacks and specifically referring to Times Square as "the next Ground Zero."

  o Among the titles in the individual's possession were:

    - The Terrorist's Handbook
    - Kitchen Improvised Plastic Explosives
    - Setting Fires with Electrical Timers: An Earth Liberation Guide

- Three Black bloc anarchists were arrested in Queens and found in possession of three imitation handguns and a video containing footage of subjects practicing handcuffed, handcuff keys, a butterfly knife, pellets, and a map of New York City. They were arrested for criminal possession of a weapon in the 4th degree.

- An individual was arrested on August 20, 2004 for criminal trespass and possession of burglary tools in the Mandarin Oriental Hotel. The subject had been arrested more than 25 times in California for various offenses including burglary, robbery, escape, possession of marijuana, and disorderly conduct.

- A prominent anarchist leader of the group "Crimethinc convergence" was arrested in August 2004 in Des Moines Iowa during a "convergence" event and charged with vandalism. Other members of the group traveled to NYC to conduct direct action protests prior to the start of the RNC, planning to deliberately provoke police in order to create a confrontation.

**Conclusion**

24

The New York City Police Department, in assuring public safety and security during the RNC, faced a three part co-mingled threat - terrorism, anarchist violence and unlawful civil disobedience. The co-mingled nature of these threats drove NYPD RNC strategy and tactics in three central ways.

- First, information gathering. It was essential to learn what was possible to learn about each element of the threat so that informed decisions could be made, decisions needed to prevent the bad outcomes other cities hosting large scale events/protests had experienced --- civil disorder or law enforcement overreaction.

- Second, arrest strategy. Because of the co-mingling of the threat it was essential that those who were actually involved in breaking the law be arrested rather than simply given summonses, allowed to move on and permitted to break the law again. The approach we took was necessary to prevent a perpetuation of violence by allowing the violence producers to produce more violence while simultaneously giving them the power to diffuse law enforcement capabilities by continually chasing them around.

- Third, arrest processing. Priority was and needed to focus on identifying who was in custody especially in light of the terrorism threat.

  o For example, on August 29, 2004, three members of a New York City based Islamic extremist organization whose ideological leader was recently deported from the United Kingdom were taken into custody at the front lobby of one of the major hotels hosting RNC delegations.

  o Given the emphasis terrorism operatives, anarchists, and direct action specialists placed on withholding their true identity fingerprinting was necessary to know, to the extent possible, definitively who was in custody. This was information critical to assuring public safety and security.

Because the NYPD was well informed, the strategy and tactics designed for the RNC were well balanced and achieved the objective of maintaining civil order, allowing 800,000 protestors to express their view while avoiding any overreaction. Indeed, by any measure police action was one of careful balance. Indeed, measured by the arrest to overall crowd size ratio the RNC NYPD record was remarkable. In total some 1,800 arrests occurred during the RNC; had the Miami arrest-crowd ratio been repeated in New York the number would have been 10,000 arrests; using the Seattle ratio, the number would have been 4,800 arrests; Quebec the number would have been 16,000; San Francisco --- over 100,000.

The demonstrators played out as expected. United for Peace and Justice attracted 800,000 to its march and rally for what the Times described as the largest protest in the

history of American political conventions.  As we anticipated, the vast majority of protestors were peaceful and law-abiding.  In the days that followed the main protest, the Police Department stopped smaller groups who tried to prevent the delegates from leaving their hotels, who tried to stop delegate buses from reaching MSG, and who tried to shut down Wall Street during the convention.

The only serious injury throughout the RNC was sustained by a police officer who was pulled from his scooter and kicked unconscious by a demonstrator.  Despite provocations, such as the assault on the scooter cop and by demonstrators throwing faux feces in the faces of police officers, the NYPD showed professionalism and restraint. The Times provided a good assessment on September 2004 of police coverage of the RNC: "It appears the New York Police Department may have successfully redefined the post-Seattle era, by showing that protest tactics designed to create chaos and attract the world's attention can be effectively countered with intense planning and a well-disciplined use of force."

Regarding information gathering, it was not political surveillance.  As noted earlier, the NYPD is and was indifferent to the political views of any attendees at any activity---protest or otherwise---in New York City.  It does, however, have a responsibility to prevent civil disorder---which was talked about openly in the anti-RNC open forums including online presentations.  NYPD would be negligent in its duties and responsibilities to ignore such warnings.  Thus the Intelligence Division's information gathering addressed what those openly talking of anarchist actions and unlawful civil disobedience actually <u>intended</u> to do --- not their political opinions.

# EXHIBIT B

# YAHOO! NEWS

Search: [                    ]  Web Search

**Home   U.S.   Business   World   Entertainment   Sports   Tech   Politics   Elections   Science   Health   Most Popular**

Video   Photos   Opinion   Local News   Odd News   Comics   Travel   Weather   Full Coverage   You Witness News   Site Index

Search:                                    All News                    [ Search ] Advanced

## Police clash with protesters at G8

REUTERS



Reuters Photo: German riot police block a road near the village of Brodhagen to keep some 3,000...

**RELATED VIDEO**


**Tensions Rise as G8 Summit Begins**
The G8 summit formally begins Wednesday, but debates are already underway.
Play video | » More ABC News video


**Raw video: G-8 protesters clash**
Police in Germany are using water cannons to hold back thousands of protestors gathering near the G8 summit; officials say at least eight police officers have been injured during the clashes. (June 6)
Play video | » More AP video

» Show all news video




THE WEEK IN PHOTOS
MAY 18-24

**NEWS ALERTS**

Get an alert when there are new stories about:

☐ President George W. Bush

By Erik Kirschbaum
2 hours, 7 minutes ago

HEILIGENDAMM, Germany (Reuters) - Around 10,000 anti-capitalist protesters clashed with police on Wednesday, injuring eight, as they tried to blockade routes to a summit of major powers in northern Germany.

Police used water cannons to push back demonstrators. Delegates from several G8 countries said the protests were limiting their ability to move around at the summit venue, a seaside resort on Germany's Baltic coast.

Eight officers were injured during the clashes with protesters near the town of Bad Doberan, police spokesman Luedger Behrens said. Police "used water cannons twice after demonstrators bombarded police with stones," he said.

Police said 15 protesters had been detained.

ADVERTISEMENT



LESS WRINKLES IN ONLY 10 MINUTES.

TRY IT TODAY!

www.dermitage.com

Protesters were trying to block access to a luxury hotel on the coast in Heiligendamm where G8 leaders including U.S. **President George W. Bush** were gathering.

By late afternoon, all three roads leading into Heiligendamm were blocked off by protesters and police in full riot gear wielding transparent shields lined the entrance to the town.

German NDR public radio said the only way into Heiligendamm was via boat or helicopter.

"We're stuck here now. The whole place looks shut down," an official from one of the delegations said by telephone from inside the summit venue.

Akie Abe, wife of Japanese Prime Minister Shinzo Abe, was forced to cancel a planned tour of the nearby Baltic resort town of Kuehlungsborn on Wednesday because of the demonstrations.

Dozens of protesters had earlier blocked a steam train being used to shuttle journalists between the summit venue and the media centre in Kuehlungsborn.

Organizers tried to arrange a boat transfer along the coast for the journalists as an alternative, but protesters briefly blocked access to that as well.

SECURITY FENCE

Add Selected Alerts

» More Alerts

ELSEWHERE ON THE WEB

CNN.COM
TB scare limits border officers'
authority on entry rules

ABC NEWS
Low Testosterone Could Kill
You

THE CHRISTIAN SCIENCE
MONITOR
In Tehran's Martyrs' Museum,
Iran courts new believers



Introducing The
Sims Life Stories
Only on
Yahoo! Games

Go Now

PEOPLE OF THE WEB



**Caught on tape**
A violent video puts a
blogger behind bars.

Some 16,000 security personnel are in the area. World leaders are shielded from thousands of demonstrators by a 12-km (7.5-mile) fence topped with barbed wire.

Behrens said roughly 10,000 demonstrators were violating a ban on demonstrations in the area and risked being detained.

Several hooded and masked protesters had clippers and were cutting through barbed wire police had laid near the fence.

The Federal Constitutional Court, Germany's highest court, ruled against plans for a demonstration on Thursday outside the fence. But with some protesters already at the fence that decision had been made largely irrelevant.

A German court handed down jail sentences to several protesters after clashes with police on Saturday in the nearby city of Rostock in which almost 1,000 people were injured.

A German man and a Spaniard were found guilty of attempted grievous bodily harm and disturbing the peace and sentenced to nine months in prison without parole, a court spokeswoman said.

A Pole was given a 6-month suspended sentence while another Spaniard was given a 10-month jail sentence.

(Additional reporting by Sabine Siebold, Brian Love, Tom Armitage and Isabel Reynolds)

**Email Story      IM Story      Printable View**

**RECOMMEND THIS STORY**
Recommend it                    Average (0 votes)
                                » Recommended Stories

## Full Coverage: Global Economy

**OFF THE WIRES**

Nominee to head World Bank starts tour in
Africa AFP, 7 minutes ago

German police battle anti-G8 protesters AFP,
14 minutes ago

**NEWS STORIES**

Climate debate heats up G-8  The Christian
Science Monitor via Yahoo! News, Jun 04

Police Tactics Under Fire After Violent Anti-
G8 Demonstrations  at Deutsche Welle, Jun
04

**FEATURE ARTICLES**

Backdrop to G-8 summit: Russia-West
tensions  at Christian Science Monitor, Jun 04

Merkel in lead role on G8 stage  at BBC,
Jun 04

**OPINION & EDITORIALS**

A Clean Start at the World Bank  at The
New York Times (reg. req'd), May 31

The poor need a better World Bank  The
Christian Science Monitor via Yahoo! News, May 21

## Top Stories

Turkish officials: Troops enter Iraq AP

Bush says Russia won't attack Europe AP

TB patient told he wasn't contagious AP

Man tries to jump into popemobile AP

Pentagon chief honors D-Day troops AP

## Most Viewed: Top Stories

Iraqi group says reaches ceasefire with al
Qaeda Reuters

U.S. opposes fixing greenhouse gas cuts at
G8 Reuters

Israel-Palestinian summit postponed amid
discord Reuters

Bush says Russia not a threat to Europe
Reuters

"Sopranos" filming locations draw mobs of





**640_pict3742_1.jpg**
original image ( 2592x1944)

Add Your Comments
© 2000-2007 San Francisco Bay Area Independent Media Center. Unless otherwise stated by the author, all content is free for non-commercial reuse, reprint, and rebroadcast, on the net and elsewhere. Opinions are those of the contributors and are not necessarily endorsed by the SF Bay Area IMC. Disclaimer | Privacy | Contact

**Attachment**
από ο,τι θυμάμαι χαίρομαι stéphane *10:03μμ, Σάββατο 2 Ιουνίου 2007*



**Attachment**
από ο,τι θυμόμαι χαίρομαι stéphane *10:08μμ, Σάββατο 2 Ιουνίου 2007*



**Attachment**
από ο,τι θυμάμαι χαίρομαι stéphane 10:03μμ, Σάββατο 2 Ιουνίου 2007



**Attachment**
από o,τι θυμάμαι χαίρομαι stéphane *10:08μμ, Σάββατο 2 Ιουνίου 2007*



κι ακόμα κι άλλες φωτό
από ο,τι θυμάμαι χαίρομαι stéphane 10:08μμ, Σάββατο 2 Ιουνίου 2007