Exhibit G

UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
DEIRDRE MACNAMARA, DEEPA MAJMUDAR, : 04 Civ. 9216 (KMK) (JCF)
ELIZABETH FLEISCHMAN, REBECCA     :
STONEBACK, JASON BARRUS, CHRIS    :
KORNICKE, RANDALL STEKETTE, WENDY :              4/20/07
STEFANELLI, DANIELLE WALSH,        :
WILLIAM HOBBS, JULIA COHEN, SIMON :
HARAK, SONIA CHANDRA, CELINE       :
MELANUM, ERIKA BIDDLE, DIANA       :
RAIMONDI, RACHEL HEINOLD, NOAH     :
CHARNEY, STACY COTLER, BARBARA and :
LEONARD FRIEDMAN, as parents and   :
natural guardians of EMILY         :
FRIEDMAN, a minor, ALI GHAHREMANI, :
as parent and natural guardian of  :
SHAHRZAD GHAHREMANI, WILLIAM       :
STEYERT, JR., CHRISTOPHER THOMAS,  :
KATE ESPOSITO, individually, and   :
on behalf of a class of all others :
similarly situated,                :
                                   :
                     Plaintiffs,   :              MEMORANDUM
                                   :              AND  ORDER
                                   :
          - against -              :
                                   :
THE CITY OF NEW YORK, a municipal  :
entity; MICHAEL BLOOMBERG, Mayor   :
of the City of New York; RAYMOND   :
KELLY, New York City Police        :
Commissioner; JOSEPH ESPOSITO,     :
Chief of Department, New York City :
Police Department; THOMAS GRAHAM,  :
Commander, Disorders Control Unit, :
New York City Police Department;   :
BRUCE SMOLKA, Assistant Chief,     :
Patrol Borough Manhattan South;    :
TERRENCE MONAHAN, Deputy Chief,    :
Patrol Borough Bronx; JOHN J.      :
COLGAN, Deputy Chief and           :
Commanding Officer, Pier 57; New   :
York Police Supervisor MICHAEL     :
INGRAM; New York Police Supervisor :
ROMAN; New York City Police        :
Officers MONA PHILLIPS, NELSON     :
RODRIGUEZ, Shield No. 21015,       :

1

```
MICHAEL FILOSETA, KEVIN SAM,      :
STEVEN CHOINSKI, TYRONE RIGGAN,   :
DAN MALLOY, BOYLE, DIEZ, Shield   :
No. 4285, MICHAEL BALICKI, ANTHONY :
MASON, BAITY and MELISSA ROMAN;   :
New York City Police Supervisors  :
and Commanders RICHARD ROEs 1-50; :
New York City Police Officers JOHN :
DOEs 1-50, individually and in    :
their official capacities, jointly :
and severally,                    :
                                  :
                    Defendants.   :
- - - - - - - - - - - - - - - - - -:
```

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

This case is one of many cases arising from the arrests of
approximately 1,800 people during the Republican National
Convention (the "RNC") in New York City in the summer of 2004.
Throughout the litigation, the City of New York and the individual
defendants (collectively, the "City") have withheld or redacted a
number of documents requested by the plaintiffs on the basis of
various privileges. On March 14, 2007, I granted in part and
denied in part the plaintiffs' motion to compel production of
documents that the City claimed were subject to the self-critical
analysis privilege, the attorney-client privilege, and the
deliberative process privilege. MacNamara v. City of New York, No.
04 Civ. 9216, 2007 WL 755401 (S.D.N.Y. March 14, 2007). The
plaintiffs now seek an order compelling the City to produce in
unredacted form additional documents that the City has withheld on
the basis of the deliberative process privilege and the law
enforcement privilege. In addition, the plaintiffs seek an order

2

reopening depositions at which the City instructed witnesses not to answer questions regarding the presence of undercover or plainclothes officers at demonstrations. For the reasons set forth below, the plaintiffs' motion is granted in part and denied in part.[1]

Discussion

A. Deliberative Process Privilege

1. Legal Standard

The deliberative process privilege "'covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated' . . . ." Tigue v. United States Department of Justice, 312 F.3d 70, 76 (2d Cir. 2002) (quoting Department of the Interior v. Klamath Water Users Protective Association, 532 U.S. 1, 8 (2001)). The privilege protects "subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Grand Central Partnership v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999) (quoting Ethyl Corp. v. United States Environmental Protection Agency, 25 F.3d 1241, 1248 (4th Cir. 1994)).

 The rationale behind the privilege is "the obvious realization that officials will not communicate candidly amongst themselves if each remark is a potential item of discovery and front page news, and its object is to

---

[1] I have reviewed in camera each of the documents at issue here.

3

enhance the quality of agency decisions, by protecting
open and frank discussion among those who make them
within the Government." <u>Klamath</u>, 532 U.S. at 8-9
(quoting <u>National Labor Relations Board v. Sears, Roebuck
& Co.</u>, 421 U.S. 132, 151 (1975)); <u>accord</u> <u>Coastal States
Gas Corp. v. Department of Energy</u>, 617 F.2d 854, 866
(D.C. Cir. 1980) ("The [deliberative process] privilege
has a number of purposes: it serves to assure that
subordinates within an agency will feel free to provide
the decisionmaker with their uninhibited opinions and
recommendations without fear of later being subject to
public ridicule or criticism; to protect against
premature disclosure of proposed policies before they
have been finally formulated or adopted; and to protect
against confusing the issues and misleading the public by
dissemination of documents suggesting reasons and
rationales for a course of action which were not in fact
the ultimate reason for the agency's action.").

<u>Tique</u>, 312 F.3d at 76.

The privilege applies to inter-agency or intra-agency
communications that are both "predecisional" and "deliberative."
<u>Tique</u>, 312 F.3d at 76. A document is "predecisional" when it is
"prepared in order to assist a decisionmaker in arriving at his
decision." <u>National Council of La Raza v. Department of Justice</u>,
411 F.3d 350, 356 (2d Cir. 2005) (quoting <u>Grand Central
Partnership</u>, 166 F.3d at 482). In order to assert the privilege,

the agency "must be able to demonstrate that . . . the
document for which . . . privilege is claimed related to
a specific decision facing the agency." <u>Tique</u>, 312 F.3d
at 80. This is to be distinguished from an agency's
"routine and ongoing process of self-evaluation," which
is not covered. <u>See id.</u> at 80 (quoting <u>Maricopa Audobon
Society v. United States Forest Service</u>, 108 F.3d 1089,
1094 (9th Cir. 1997)).

<u>Haus v. City of New York</u>, No. 03 Civ. 4915, 2004 WL 3019762, at *3
(S.D.N.Y. Dec. 29, 2004). A document is "deliberative" when it is

4

"actually . . . related to the process by which policies are formulated." La Raza, 411 F.3d at 356 (quoting Grand Central Partnership, 166 F.3d at 482). The privilege "does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." Tigue, 312 F.3d at 80 (quoting Grand Central Partnership, 166 F.3d at 482).

"Purely factual" material is not protected by the privilege. Grand Central Partnership, 166 F.2d at 482; see also National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 93 (S.D.N.Y. 2000); Resolution Trust Corp. v. Diamond, 137 F.R.D. 634, 640-41 (S.D.N.Y. 1991). Furthermore, the privilege is a qualified one, requiring courts to balance the agency's interest in non-disclosure against "the public interest in opening for scrutiny the government's decision-making process." Resolution Trust Corp., 137 F.R.D. at 642 (quoting In Re Franklin National Bank Securities Litigation, 478 F. Supp. 577, 582 (E.D.N.Y. 1979)).

## 2. Civil Disturbance Subcommittee Documents

The New York City Police Department (the "NYPD") began planning for the RNC more than a year before the convention. (Declaration of Raymond W. Kelly dated Feb. 23, 2007 ("Kelly Decl."), attached to Letter of Cheryl L. Shammas dated Feb. 23, 2007 ("Shammas 2/23/07 Letter"), ¶ 2). To facilitate planning, the work was divided among several committees, each of which assigned

tasks to various subcommittees. (Kelly Decl., ¶ 2). The committees were overseen by Assistant Chief Jack McManus, the NYPD's RNC Coordinator. (Kelly Decl., ¶ 2). The NYPD Executive Committee held weekly meetings at which Assistant Chief McManus, Police Commissioner Raymond W. Kelly, and various other high-ranking NYPD officials discussed the merits of the committees' recommendations. (Kelly Decl, ¶¶ 3-4).

One of the committees involved in RNC planning was the Civil Disturbance/Prisoner Processing Subcommittee (the "Civil Disturbance Subcommittee"), which included representatives from the NYPD, the United States Secret Service, and various other city, state, and federal agencies. (Kelly Decl., ¶¶ 5-6). The City has withheld agendas for Civil Disturbance Subcommittee meetings held on January 13, May 5, and July 21, 2004, as well as memoranda describing what was discussed at each meeting. The meeting agendas contain lists of new members, lists of attendees at previous meetings, and brief summaries of issues discussed at previous meetings. The memoranda, written by various NYPD officials for the benefit of Assistant Chief McManus, consist of brief descriptions of issues and plans discussed at the meetings. Having reviewed these documents in camera, I find that they do not fall within the scope of the deliberative process privilege.

As an initial matter, lists of committee members and persons in attendance at meetings are plainly factual information not

subject to the privilege. Moreover, while it is true in some sense that the documents "reflect deliberations and discussions" about plans for the RNC (Shammas 2/23/07 Letter at 4), that bare assertion is, as I have said before, insufficient to justify application of the privilege. See Schiller v. City of New York, No. 04 Civ. 7922, 2007 WL 136149, at *9-10 (S.D.N.Y. Jan. 19, 2007) (rejecting claim of privilege based upon assertion that document "reflect[ed] internal discussions among top NYPD executives, recommendations and proposals for policing the RNC"). The summaries contained in the meeting agendas merely state that certain issues were discussed. They are descriptive rather than deliberative, and do not contain the personal opinions of any member of the committee or even the recommendations of the committee as a whole. The memoranda, which are essentially minutes of the meetings, similarly do not contain the recommendations or opinions of the writers or of any other members of the committee, but merely describe the issues discussed.

The City attempts to bolster its assertion of the privilege with an affidavit from Commissioner Kelly in which he states that the Executive Committee "at its [] weekly meetings, assessed the merits of [] proposals [put forward by the various RNC committees] while engaging in discussions and deliberations on various planning tasks and operational issues that needed to be addressed." (Kelly Decl., ¶ 3). While this statements is undoubtedly true, it does

not establish that the particular documents at issue here were created "in order to assist an agency decisionmaker in arriving at" a particular decision. La Raza, 411 F.3d at 356 (quoting Grand Central Partnership, 166 F.3d at 482). Instead, the documents describe reports from various agencies and committees regarding the current state of plans for the RNC. The deliberative process privilege "does not operate indiscriminately to shield all decision-making by public officials" from discovery in civil cases. Grossman v. Schwartz, 125 F.R.D. 376, 381 (S.D.N.Y. 1989) (citation omitted). These memoranda are not "contemplative, deliberative, analytical documents, weighing the pros and cons of a given course of action." Associated Press v. United States Department of Defense, No. 05 Civ. 5468, 2006 WL 2707395, at *8 (S.D.N.Y. Sept. 20, 2006). They cannot be considered "deliberative" because they are not "indicative of the agency's thought processes," Local 3, International Brotherhood of Electrical Workers v. National Labor Relations Board, 845 F.2d 1177, 1180 (2d Cir. 1988), and do not reflect "the give-and-take of the consultative process." Coastal States Gas Corp., 617 F.2d at 866. Accordingly, they are not subject to the privilege and must be disclosed.

### 3. Criminal Justice Bureau Documents

The NYPD Criminal Justice Bureau (the "CJB") was responsible for developing plans for arrest processing during the convention. (Kelly Decl., ¶ 2). The City has withheld the following CJB-

related documents: (1) a February 19, 2004 memorandum from Deputy Inspector Matthew Pontillo of the CJB to Assistant Chief McManus; (2) a PowerPoint presentation dated April 1, 2004 entitled "Arrest Processing Plan for the Republican National Convention"; (3) a document containing hand-drawn and computer-generated flow charts illustrating the Mass Arrest Processing Plan (the "MAPP") for the RNC; and (4) an undated PowerPoint presentation describing plans for the use of 100 Centre Street as an arrest processing site during the RNC.

The February 19, 2004 memorandum outlines plans discussed at a meeting held that day between Assistant Chief McManus, Assistant Chief Patrick Devlin, and Deputy Inspector Pontillo. Much like the memoranda described above, it is not deliberative; it simply sets forth the current state of plans for the RNC and indicates that several topics had been identified as "issues." The remaining documents are also not deliberative. They describe the MAPP that the NYPD was planning to use at the time the documents were created. There is no reason to believe that disclosure of these documents would stifle "open and frank discussion," Tigue, 312 F.3d at 76 (quoting Klamath, 532 U.S. at 8-9), because the documents neither evaluate various alternatives nor discuss any particular individual's opinions or ideas regarding the NYPD's plans for the RNC. Nor do they "suggest[] reasons and rationales for a course of action which were not in fact the ultimate reason for the agency's

action." <u>Coastal States Gas Corp.</u>, 617 F.2d at 866. They contain factual information regarding the MAPP that the NYPD planned to use at the time the documents were created.[2] The fact that the MAPP described therein is not the same MAPP that was ultimately used, (Shammas 2/23/07 Letter at 5), does not bring non-deliberative documents within the scope of the privilege. Therefore, these documents must also be disclosed to the plaintiffs.

    4. E-mails

    The City has also withheld two e-mails and redacted a third on the basis of the deliberative process privilege. The withheld e-mails are both dated August 5, 2004, and were sent by Paul J. Browne of the NYPD to Edward Skyler of the Office of the Mayor. The redacted e-mail is dated August 10, 2004, and was sent by Detective Michael Gorsky to Assistant Chief John Colgan.

    The withheld e-mails relate to a planned meeting to be attended by the Mayor and the Police Commissioner on August 9, 2004. Both include a list of "Possible Mayor Talking Points" suggested by Mr. Browne, and one includes a description of the NYPD's plans to stage drills prior to the RNC. The City contends that these e-mails are protected by the privilege because they

---

[2] The April 1, 2004 PowerPoint presentation also contains factual information regarding the MAPP used for a February 15, 2003 demonstration against the then-impending war in Iraq. The flow chart document has a cover page briefly listing "issues" to be considered, but does not contain any statements that could reasonably be considered "deliberative."

reflect the opinions and suggestions of the writer and "were communicated prior to any final decision on the topic discussed." (Shammas 2/23/07 Letter at 6). However, as noted above, the deliberative process privilege does not "shield all decision-making by public officials." Grossman, 125 F.R.D. at 381. As I stated in a prior decision in a related RNC action,

> [i]n arguing that the deliberative process privilege applies to these documents, among others, the City asks the Court to accept that virtually all decisions made by the NYPD [and other agencies] regarding the RNC were matters of important public policy. See Soto v. City of Concord, 162 F.R.D. 603, 612 (N.D. Cal. 1995) ("The deliberative process privilege should be invoked only in the context of communications designed to directly contribute to the formulation of important public policy."). This is plainly not the case. Instead, the Court must determine in each case whether the decision at issue was a "routine operating decision" rather than a "policy oriented judgment" to which the privilege would apply. See E.B. v. New York City Board of Education, 233 F.R.D. 289, 293 (E.D.N.Y. 2005).

Schiller, 2007 WL 136149, at *10. Whether or not the Mayor should use Mr. Browne's suggested "talking points" is not the sort of public policy decision that falls within the scope of the privilege. The discussion of planned security drills is also not covered by the privilege, because even assuming that security drills qualify as a matter of policy, the e-mail does not contain anything that could be characterized as a recommendation, proposal, or opinion regarding the drills.

The redacted e-mail relates to the NYPD's use of Pier 57 as a "Post-Arrest Staging Site." The City asserts that the e-mail

11

contains Detective Gorsky's "opinions" regarding "the preparation of Pier 57" for use during the RNC. (Shammas 2/23/07 Letter at 6). However, in an earlier decision, I found that "[d]ecisions regarding work to be done at Pier 57 [in preparation for the RNC] are routine operating decisions" not subject to the privilege. <u>Schiller</u>, 2007 WL 136149, at *10. Furthermore, having reviewed the e-mail, I find it does not contain anything that could plausibly be characterized as an "opinion." The redacted portions of the e-mail are not deliberative. The City must therefore produce an unredacted copy of this e-mail, as well as the two e-mails it has withheld.

B. <u>Law Enforcement Privilege</u>

1. <u>Legal Standard</u>

The purpose of [the law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

<u>In re Department of Investigation of the City of New York</u>, 856 F.2d 481, 484 (2d Cir. 1988) (citation omitted). In order to sustain the privilege, a party "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege." <u>Kunstler v. City of New York</u>, Nos. 04 Civ. 1145, 04

Civ. 665, 04 Civ. 2611, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005); see also MacWade v. Kelly, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) (stating that party asserting law enforcement privilege "must make a clear showing of harm").

This privilege, like the deliberative process privilege, is a qualified one. See Kunstler, 2005 WL 2656117, at *1; MacWade, 230 F.R.D. at 381. When determining whether to order disclosure, courts should therefore "'balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.'" Kunstler v. City of New York, 439 F. Supp. 2d 327, 328 (S.D.N.Y. 2006) (quoting Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984)); accord Kitevski v. City of New York, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. March 16, 2006). "However, the party asserting the privilege must 'make a threshold showing that the privilege attaches' before the court is required to balance the parties' interests." City of New York v. Beretta U.S.A. Corp., 222 F.R.D. 51, 66 (E.D.N.Y. 2004) (quoting United States v. United States Currency in the Sum of Twenty One Thousand Nine Hundred Dollars, No. 98 CV 6168, 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999)).

2. Disorder Control Incident Documents

Prior to the RNC, a number of high-ranking NYPD officials met at the Police Commissioner's office to plan for "anticipated types

13

of possible civil disorder." (Declaration of Thomas Graham ("Graham Decl."), attached to Shammas 2/23/07 Letter, ¶ 6). At these meetings, the officials reviewed documents known as "Disorder Control Incident Tabletop Exercises" ("Tabletop Exercises"), which contain "hypothetical scenarios" involving what the City refers to as "terrorist activity." (Graham Decl., ¶ 6). The Tabletop Exercises also contain "talking points" intended to stimulate discussion regarding potential problems the NYPD might encounter in dealing with similar incidents. (Graham Decl., ¶ 7). After these meetings, unspecified persons prepared "Control Incident Action Items" ("Action Items"), which contain "proposed courses of action to be undertaken by [NYPD officials]" to address issues identified during the Tabletop Exercises. (Graham Decl., ¶ 8). The City has withheld both the Tabletop Exercises and the Action Items on the basis of the law enforcement privilege.

The City relies on an affidavit from Chief Thomas Graham, Commanding Officer of the Disorder Control Unit, in which he claims that disclosure of the Tabletop Exercises and Action Items

> would educate groups with a history of unlawful or violent behavior and would-be terrorists about how the Department would respond to the scenarios therein and the types of scenarios that the Department is prepared to handle (and hence may not be prepared to handle). It also educates individuals on disruptive tactics typically used at demonstrations and the Department's methods and weaknesses in addressing those tactics. It would similarly educate them on how to commit egregious acts against the City; on how to shut down various City facilities and/or systems of mass transportation; on how to divert police resources; and on how to evade

14

apprehension.

(Graham Decl., ¶ 9).

The Tabletop Exercises contain several brief hypothetical scenarios in which demonstrators threaten to wreak havoc in New York City during the RNC. The City does not contend that these scenarios contain, or are based upon, actual intelligence information. As noted above, these scenarios are followed by very broad questions intended to stimulate discussion. The Action Items are vague instructions to various units within the NYPD. For example, the Action Items include instructions such as "develop a plan or strategy" for a particular type of incident, "ensure adequate staffing resources" for certain units, and "determine the technical feasibility" of a given strategy. Neither type of document contains sufficiently specific information to raise legitimate concerns about educating demonstrators regarding the NYPD's tactical weaknesses or its strategies for dealing with mass disorder. Similarly, the City's claim that these documents would educate protesters about how to "commit egregious acts" against the City is overblown. Another court has addressed a similar claim in an unrelated mass-demonstration case, finding that

> review of the materials in question demonstrates that the [materials] are pitched at such a high level of generality that the harm anticipated by [Chief Graham] from public dissemination is simply unconvincing. Indeed, the information . . . is both predictable and lacking in specific detail, and hence there is no reason to believe that, even if it fell into the hands of someone intent on violence, it would offer meaningful

assistance in evasive tactics.

Kunstler, 2005 WL 2656117, at *3 (holding that law enforcement privilege did not apply to NYPD "Disorder Control Guidelines").

Moreover, there is a protective order in place in the consolidated RNC actions that permits the City to designate documents produced in discovery as "confidential." Accordingly, the information contained in these documents will not be circulated publicly, but will be viewed only by plaintiffs' counsel. The City has offered "no information suggesting that such limited production and circulation, with appropriate safeguards for return of these materials at the conclusion of the litigation, poses any threat to public order or safety."[3] Id.; see also Haus, 2004 WL 3019762, at *5 (S.D.N.Y. Dec. 29, 2004) ("[G]iven the fact that these documents may be produced under the terms of a strict confidentiality order, it is entirely unclear how defendants expect that these supposedly sensitive items of information will be dispersed over the internet

---

[3] I find unpersuasive the City's contention that as a result of my recent decision in Schiller, 2007 WL 136149, the defendants "can no longer rely on the protections of the protective order." (Shammas 2/23/07 Letter at 10). In that decision, I found that the City had not shown good cause for the confidentiality designations it had assigned to various documents pursuant to the protective order. Under the protective order, which remains in place, any confidentiality designation remains in place until challenged by the other party, at which point the designating party bears the burden of establishing that there is good cause under Rule 26(c) of the Federal Rules of Civil Procedure. Good cause exists when "disclosure will result in a clearly defined, specific, and serious injury." In Re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting Shingara v. Skiles, 420 F.3d 301, 306 (3d Cir. 2005)).

to enable future demonstrators to outwit the Police Department.").

3. Legal Subcommittee Meeting Documents

The City has produced to the plaintiffs two memoranda, dated January 7, 2004 and March 2, 2004, from Deputy Chief John P. Gerrish to Assistant Chief McManus, among others, describing Legal Subcommittee meetings. The City has redacted portions of these memoranda on the basis of the law enforcement privilege.[4]

With respect to the January 7 memorandum, the City claims that part of the redacted material "pertain[s] to the use of modern technology," and that it would "inform individuals who are intent on committing criminal activity about the existence and use of the technology." (Graham Decl., ¶ 16). The remainder, according to the City, "contains information about the ongoing techniques and methods of investigation of the NYPD's Intelligence Division." (Shammas 2/23/07 Letter at 14). The City contends that "[d]isclosure of this information would undermine the viability of those techniques and methods . . . and [] compromise the NYPD[] Intelligence Division's abilities to investigate anticipated unlawful activity and prevent civil disorder at future demonstrations." (Graham Decl., ¶ 17). Having reviewed the redacted material, I find that there is no basis for these

_____

[4] The City has agreed to restore one redacted portion of the March 2, 2004 memorandum that contains "information obtained from public sources." (Shammas 2/23/07 Letter at 14). I will therefore address only the remaining redactions.

conclusory assertions.  The City's "generalizations plainly fail[]
to justify invocation of the privilege in light of the type of
information actually withheld."  Haus, 2004 WL 3019762, at *4.

The City contends that in reviewing the redacted sections of
the March 2, 2004 memorandum, it has determined that they "reflect
[] communications between the NYPD Legal Bureau [] and its
clients."  (Shammas 2/23/07 Letter at 14).  Accordingly, the City
now asserts the attorney-client privilege, rather than the law
enforcement privilege, with respect to these sections.  The first
redacted paragraph, which is paragraph 8(a) of the memorandum, does
not appear on its face to be a communication made for the purpose
of obtaining legal advice, and the City has given me no reason to
believe that it is.  The second redacted paragraph, which is
paragraph 10, does appear to be an attorney-client communication
regarding legal advice.

Accordingly, the City must produce these memoranda in
unredacted form with the exception of paragraph 10 of the March 2,
2004 memorandum, which it may redact.

### 4. Mobile Reserve Sector After-Action Report and Emergency Operations Center RNC Incident Reports

The "Mobile Reserve Sector After-Action Report" ("After-Action
Report"), authored by Chief Graham, is a "self-critique report" of
the kind described in my March 14, 2007 decision.[5]  See MacNamara

---

[5] The City also asserts that this document is subject to the
self-critical analysis privilege.  (Shammas 2/23/07 Letter at 15;

v. City of New York, No. 04 Civ. 9612, 2007 WL 755401, at *2
(S.D.N.Y. March 14, 2007). The document entitled "Emergency
Operations Center RNC Incident Reports" ("Incident Reports") is a
computer log of RNC-related incidents.

The City has redacted from both documents information
regarding "how many officers (and of what rank) were deployed
during the RNC at certain locations throughout New York City"
(Graham Decl., ¶¶ 18, 20), and has redacted from the Incident
Reports "specific methods of investigation[] . . . used by the
NYPD." (Graham Decl., ¶ 20). The City has also redacted the
section entitled "Key recommendations" from the After-Action
Report, along with information regarding daily NYPD operations
during the RNC. The City claims that disclosure of this
information would "severely compromise the effectiveness" of future
deployments by permitting individuals intent on criminal activity
to anticipate how the NYPD will respond to particular types of
events. (Graham Decl., ¶¶ 19-20). This explanation is once again
so vague that it provides little assistance to the Court in
determining whether the privilege applies.

Another court has already rejected the City's claim that

---

RNC Defendants' Privilege Log 2/3/06, attached as Exh. A to Letter
of Jonathan C. Moore dated Jan. 10, 2007 ("Moore 1/10/07 Letter"),
at 7). I have already rejected this contention with respect to
such "after-action reports." See MacNamara, 2007 WL 755401, at *2-
6. In its opposition to the instant motion, the City has given me
no reason to reconsider that decision.

information regarding the number and rank of officers deployed at demonstrations is protected by the law enforcement privilege. Haus, 2004 WL 3019762, at *4-5. That court found that

> [t]he number of police at specific locations was an observable fact at the time of the [] demonstration. Moreover, why that information would be useful to people supposedly bent on mayhem in future demonstrations is entirely a matter of mystery. Presumably, such demonstrations will occur in different locales, will feature larger (or smaller) numbers of demonstrators, will pose different potential threats of law-breaking and will thus present different contexts for the police to invest manpower in specific locations.

Id. at *5. Furthermore, the remaining redacted information in the After-Action report is highly specific to the RNC, and it is difficult to imagine how it could be useful to persons determined to foil the NYPD's efforts to keep order at future demonstrations. The "specific methods of investigation" redacted from the Incident Reports are not described in any detail, and I see no reason to believe that the disclosure of a mere mention of a type of technology would jeopardize the NYPD's ability to conduct future investigations using that technology.

The City shall produce both documents to the plaintiffs without the redactions described above, but may redact information contained in the After-Action Report regarding locations considered to be potential terrorist targets. (Bates Nos. 15011-15014).

5. Critical Mass Bike Block Demonstration Presentation

This document is a PowerPoint presentation that outlines the NYPD's planned response to a Critical Mass bicycle ride that took

place on August 27, 2004, several days before the RNC.[6] (Graham Decl., ¶ 21). The City contends, somewhat vaguely, that this plan "will likely be used to combat unlawful conduct at future Critical Mass Bike Riders," and that disclosure would "render it ineffective." (Graham Decl., ¶ 21).

The plan outlined in the PowerPoint presentation focuses on a specific route that the riders were expected to take on August 27, 2004, and contains photographs of locations along the route. It is difficult to see how disclosure of this plan would jeopardize the NYPD's ability to police future Critical Mass rides, as the City has given the Court no indication that this particular route has been used by Critical Mass riders since the RNC, or that they are likely to use it again. Moreover, the document refers to a number of police tactics that are by now public knowledge. See Randal C. Archibold et al., 100 Cyclists Are Arrested as Thousands Ride in Protest, N.Y. Times, August 28, 2004, at B1. The document will

---

[6] According to the City's privilege log, this document was also withheld on the basis of the deliberative process privilege. (RNC Defendants' Privilege Log 11/8/06 ("11/8/06 Log"), attached as Exh. B to Moore 1/10/07 Letter, at 6). The City has not addressed that claim in its opposition to the plaintiffs' motion. In any case, the document is not deliberative, and therefore not subject to the privilege.

Along with the document entitled "Critical Mass Bike Block Demo," the City has submitted a document referred to in its privilege log as "3 Squad Platoon Formations." (11/8/06 Log at 6). The plaintiffs do not appear to have challenged the City's assertions of privilege with respect to this document, and I assume that it was submitted in error.

presumably be released pursuant to the terms of the protective order, and there is no reason to believe that such limited disclosure would jeopardize law enforcement interests.

      6. <u>Undercover Officers</u>

      Finally, the plaintiffs challenge the City's assertion of the law enforcement privilege to bar questioning at depositions regarding the presence of undercover officers at RNC-related demonstrations. The City asserts that "confirmation of [the presence of undercover and plainclothes officers at demonstrations] will defeat the element of uncertainty, which itself deters criminal activity." (Shammas 2/23/07 Letter at 12). However, the fact that the NYPD has used undercover officers at protests is already widely known. <u>See</u> Jim Dwyer, <u>Police Memos Say Arrest Tactics Calmed Protests</u>, N.Y. Times, March 17, 2006, at A1; Jim Dwyer, <u>New York Police Covertly Join In at Protest Rallies</u>, N.Y. Times, Dec. 22, 2005, at A1. It is difficult to imagine how disclosure of whether undercover officers were present at specific demonstrations more than two years ago will do anything further to eliminate "the element of uncertainty." Thus, the City has not made a sufficient showing of harm to demonstrate that the law enforcement privilege is applicable here. <u>See</u> <u>Kunstler</u>, 439 F. Supp. 2d at 328 (affirming magistrate judge's ruling that law enforcement privilege did not apply to presence of undercover police officers at February 15, 2003 anti-war demonstration).

Accordingly, the plaintiffs may question witnesses at depositions regarding the presence and activities of undercover officers at RNC-related demonstrations, and may re-call those witnesses who have previously been instructed not to answer such questions.

The plaintiffs seek to discover the identities of undercover officers, "at a minimum," insofar as those officers "witnessed, participated in, or provided information for their arrest and detention." (Letter of Jonathan C. Moore dated March 16, 2007 at 10). The plaintiffs are entitled to discover the identity of such officers, given the relevance of that information to their claims. Of course, that information may be designated "confidential" pursuant to the protective order and thereby limited to plaintiffs' counsel. If the City determines that disclosure of an officer's identity to plaintiffs' counsel would pose a significant safety risk to the officer or would jeopardize an ongoing investigation, the City may seek appropriate relief, such as an order permitting the City to identify the officer by shield number or pseudonym.

The City has also withheld two documents that relate to the use of undercover officers: (1) a June 4, 2004 memorandum from Deputy Chief Louis M. Croce to Chief McManus, and (2) an August 9, 2004 memorandum from Chief Graham to the Commanding Officer of the Building Maintenance Section. The June 4, 2004 memorandum lists officers "deemed qualified to be plainclothes officers" during the RNC. (Shammas 2/23/07 Letter at 13). This information is

23

irrelevant to the plaintiffs' claims, and the document need not be produced.  The August 9, 2004 memorandum appears to relate to the use of undercover or plainclothes officers, but does not identify, or provide a means to identify, any such officers.  Accordingly, it must be produced.[7]

Conclusion

With the exceptions noted above, the documents that are the subject of the plaintiffs' motion must be produced in unredacted form.  The plaintiffs may also re-call certain witnesses in order to make inquiries regarding the presence of undercover officers at RNC-related demonstrations.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       April 20, 2007

Copies mailed this date:

Jonathan C. Moore, Esq.
Rachel Kleinman, Esq.
Clare Norins, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue
New York, New York 10016

---

[7] The memorandum contains an officer's cell phone number, which may of course be redacted.

Exhibit H

UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
MICHAEL SCHILLER, et al.,              : 04 Civ. 7922 (KMK) (JCF)
                                       :
              Plaintiffs,              :
                                       :                    8/6/07
       - against -                     :
                                       :
THE CITY OF NEW YORK, et al.,          :
                                       :
              Defendants.              :
- - - - - - - - - - - - - - - - - -:
HACER DINLER, et al.,                  : 04 Civ. 7921 (KMK) (JCF)
                                       :
              Plaintiffs,              :
                                       :
       - against -                     :                 MEMORANDUM
                                       :                 AND  ORDER
THE CITY OF NEW YORK, et al.,          :
                                       :
                                       :
              Defendants.              :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

       These are two of the many cases that arise from the arrests of

demonstrators during the Republican National Convention (the "RNC")

in 2004.  At issue here is a document request served upon the

defendants on March 29, 2007 ("Request No. 97").  The defendants

(hereinafter the "City") objected to production of the requested

documents on a number of grounds, including overbreadth, lack of

relevance, and the law enforcement privilege.  The plaintiffs then

moved to compel the defendants to produce the documents in

question.  In an order dated May 18, 2007, I held that Request No.

97 was not overly broad and was reasonably calculated to lead to

the discovery of admissible evidence.  Because the issue of the

1

applicability of the law enforcement privilege had not yet been addressed by the parties, I did not order production of the documents at that time. That issue has now been fully briefed, and I have reviewed the disputed documents in camera.

For the reasons set forth below, the plaintiffs' motion to compel production of the documents is granted in part and denied in part. Portions of the documents sought by the plaintiffs are subject to the law enforcement privilege. However, the privileged material may be redacted in order to provide the plaintiffs with the information necessary to the litigation. I have provided the defendants with copies of the documents redacted in accordance with the principles discussed below, and they must be produced to the plaintiffs in that form.

Background

A. NYPD Intelligence Division

Deputy Commissioner David Cohen heads the Intelligence Division of the New York City Police Department (the "NYPD"). Prior to the RNC, the Intelligence Division was responsible for collecting information regarding the nature of planned protest activity in order to assess possible threats to security. (Declaration of David Cohen dated May 2, 2007 ("Cohen 5/2/07 Decl."), ¶¶ 1, 6). Means used to gather such information included the utilization of confidential informants and the assignment of

2

undercover officers[1] to monitor the activities and plans of organizations that the NYPD thought were likely to engage in unlawful activity at the RNC.[2]

Commissioner Cohen analyzed the information gathered by his staff and then briefed the RNC Executive Committee on "potential disruptive behavior" at the RNC. (Cohen 5/2/07 Decl., ¶ 9; Letter of Gerald S. Smith dated Feb. 21, 2007 ("Smith 2/21/07 Letter"), attached as Exh. C to Declaration of Palyn Hung dated April 12, 2007 ("Hung 4/12/07 Decl."), at 2-3). Members of the Executive Committee, which included Police Commissioner Raymond Kelly, Chief of Department Joseph Esposito, and other high-ranking NYPD officials, were responsible for formulating the policies challenged by the plaintiffs in these cases. (Cohen 5/2/07 Decl., ¶ 9; Smith 2/21/07 Letter at 2-3, 5). Among these policies are (1) the NYPD's decision to fingerprint all arrestees and (2) the decision not to issue summonses but instead to require that all arrestees be

---

[1] In the interest of brevity, I will generally refer in this opinion only to the use of undercover officers, not to confidential informants. In any event, the distinction is not material to the analysis here.

[2] The City maintains that these undercover officers "were engaged in investigations authorized under specific provisions in the Patrol Guide known as the Handschu Guidelines." (Declaration of David Cohen dated June 6, 2007 ("Cohen 6/6/07 Decl."), ¶ 6 n.4). See Handschu v. Special Services Division, No. 71 Civ. 2203, 2007 WL 1711775, at *1-3 (S.D.N.Y. June 13, 2007) (summarizing history of consent decree governing NYPD investigations of political activity). It is not my role in this litigation to determine whether the investigation undertaken by the Intelligence Division prior to the RNC was permissible under the Handschu Guidelines.

arraigned before being released. (Smith 2/21/07 Letter at 5).
According to the defendants, these policies were based on
intelligence information obtained in advance of the RNC and
presented to the RNC Executive Committee by Commissioner Cohen.
(Smith 2/21/07 Letter at 5).

B. Disputed Documents[3]

On January 19, 2007, the City identified 600 pages of
intelligence-related documents that had not previously been
disclosed to the plaintiffs in the course of discovery.[4] The
plaintiffs subsequently determined that those documents "were only
part of Defendants' pre-RNC intelligence gathering." (Letter of
Palyn Hung dated April 12, 2007 ("Hung 4/12/07 Letter") at 2).
Accordingly, the plaintiffs served Request No. 97, which seeks:

> All documents -- whether in the form of raw reports,
> summaries, or any other form -- containing information
> gathered, collected, or otherwise obtained by the NYPD's
> Intelligence Division between April 1, 2003 and September
> 2, 2004 about individuals, groups, or entities connected
> to demonstrations expected to take place in New York City

---

[3] The factual background of the instant dispute is set out in
greater detail in prior opinions. See Schiller v. City of New
York, Nos. 04 Civ. 7922, 04 Civ. 7921, 2007 WL 1461378, at *1-2
(May 18, 2007); Schiller v. City of New York, Nos. 04 Civ. 7922, 04
Civ. 7921, 2007 WL 735010, at *1-2 (March 12, 2007).

[4] The City refers to these documents as "end-user reports."
(Cohen 6/6/07 Decl., ¶ 5). In an order dated May 4, 3007, I found
that the defendants had not demonstrated good cause for designating
the end-user reports "confidential" pursuant to the protective
order that governs in these cases. See Schiller v. City of New
York, Nos. Nos. 04 Civ. 7922, 04 Civ. 7921, 2007 WL 1299260
(S.D.N.Y. May 4, 2007). The end-user reports have since been
released to the public.

in conjunction with the Republican National Convention. This request includes but is not limited to DD5s, tape recordings, video recordings, photographs, computer files, e-mails, and web pages.

(Plaintiff's Sixth Request for Documents, attached as Exh. I to Hung 4/12/07 Decl., at 4). As explained above, I previously determined that this request was not overly broad and was sufficiently likely to lead to the discovery of admissible information. Schiller, 2007 WL 1461378, at *2-3.

The City has asserted the law enforcement privilege with respect to three categories of documents responsive to Request No. 97. The first category consists of "field intelligence reports," also known as "DD5s", which are prepared by undercover police officers or their "handlers."[5] The City contends that these reports are protected by the privilege in their entirety. The second category includes 84 other documents that the City claims are privileged in their entirety. The third category consists of 177 documents that the City is willing to produce with certain redactions. (Cohen 6/6/07 Decl., ¶¶ 6-7).

Discussion

A. Law Enforcement Privilege

The purpose of the law enforcement privilege

---

[5] "Handlers" are the officers "responsible for working with undercovers on a daily basis." They are "engaged in confidential assignments," and the fact that they are assigned to work with an undercover officers is "known only by NYPD Intelligence Division personnel." (Cohen 6/6/07 Decl., ¶ 18).

5

is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

In re Department of Investigation of the City of New York, 856 F.2d 481, 484 (2d Cir. 1988). Parties seeking the protection of the privilege "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege." Kunstler v. City of New York, Nos. 04 Civ. 1145, 04 Civ. 665, 04 Civ. 2611, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005); see also MacWade v. Kelly, 230 F.R.D. 379, 381 (S.D.N.Y. 2005) (party asserting law enforcement privilege "must make a clear showing of harm").

The privilege is a qualified one. See Kunstler, 2005 WL 2656117, at *1; MacWade, 230 F.R.D. at 381. When determining whether to order disclosure, courts should "'balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.'" Kunstler v. City of New York, 439 F. Supp. 2d 327, 328 (S.D.N.Y. 2006) (quoting Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984)); see also Kitevski v. City of New York, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. March 16, 2006); Borchers v. Commercial Union Assurance Co., 874 F. Supp. 78, 80 (S.D.N.Y. 1995). "However, the party asserting the privilege must 'make a

6

threshold showing that the privilege attaches' before the court is required to balance the parties' interests." <u>City of New York v. Beretta</u>, 222 F.R.D. 51, 66 (E.D.N.Y. 2004) (quoting <u>United States v. United States Currency in the Sum of Twenty One Thousand Nine Hundred Dollars</u>, No. 98 CV 6168, 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999)).

     B. <u>Applicability of the Privilege</u>

        1. <u>Field Intelligence Reports</u>

The field intelligence reports are daily reports that describe an undercover officer's observations.[6] Each "contain[s] extremely detailed information about a particular activity including the geographic location, the premises, the time of meetings, numbers of persons present often identifying them by name, relationships between undercovers and confidential informants and other contacts they may have, as well as methods of communication and the means by which information is gathered." (Cohen 6/6/07 Decl., ¶ 22). In a declaration filed in support of the City's assertion of privilege, Commissioner Cohen divides the information contained in the reports into seven categories: (1) case number, (2) date of report, (3) date of opening of investigation, (4) unit reporting, (5) person reporting, (6) date, time, and location information, and (7) "description of activities, including name of organization(s), name

---

     [6] Some of these reports are written by the officers' handlers, others by the officers themselves.

and/or description of individual(s), meeting attended, topics discussed, conversations engaged in or overheard, things observed." (Cohen 6/6/07 Decl., ¶¶ 16, 18). Commissioner Cohen claims that these documents are protected by the privilege in their entirety because disclosure of "any portion of the information contained in" the reports would permit identification of the undercover officer involved, would reveal the "size and capabilities of the NYPD undercover program," and would disclose the "methods used by the NYPD in an undercover investigation." (Cohen 6/6/07 Decl., ¶ 17).

In their reply brief, the plaintiffs indicate that they do not seek "information about confidential sources and techniques, which indisputably are covered by the law-enforcement privilege and which are irrelevant to the issues before this Court." (Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Compel the Production of Documents ("Pl. Reply") at 6). With respect to the field reports, the plaintiffs therefore "seek none of the information in categories 1-6 and from category 7 do not need 'description of activities,' 'name and/or description of individuals,' or 'meeting attended.'" (Pl. Reply at 7). They seek only "information the [Intelligence D]ivision gathered about Convention-related protest activity (including any NYPD assessments of that information)."[7] (Pl. Reply at 6). They argue that this

_____

[7] The City contends that the plaintiffs' use of the phrase "Convention-related protest activity" in their reply narrows the scope of Request No. 97. The City claims that "[i]n response to

8

information is highly relevant, since it is "the very information
the City claims justified its actions." (Pl. Reply at 8 n.3).

The issue, therefore, is whether it is feasible to redact the
field intelligence reports so as to permit the plaintiffs to review
them without revealing the identities of undercover officers or
disclosing confidential NYPD tactics and strategies. After
reviewing the documents, I have determined that it is.[8] Where a

---

[the plaintiffs'] original request, defendants identified 'all
documents' 'containing information' 'about individuals, groups, or
entities connected to demonstrations' [during the RNC] -- not just
documents discussing 'convention related protest activity.'"
(Letter of Peter G. Farrell dated June 15, 2007 at 2).
Accordingly, the City initially declined to produce for in camera
review many of the documents responsive to the plaintiffs' original
request. I ordered the City to produce for in camera inspection
all of the documents it initially identified as being responsive to
Request No. 97. Upon review, it is apparent that some of the
information contained in those documents tends to reveal law
enforcement strategies and the identities of undercover officers.
Most of this information is also irrelevant because it relates to
activities unrelated to planned protests at the RNC. As explained
below, this information may be redacted from the documents before
they are produced to the plaintiffs.

[8] Redaction of privileged information is an appropriate means
to address legitimate law enforcement concerns if it may be
accomplished without destroying the sense of the information left
unredacted. See, e.g., Vodak v. City of Chicago, No. 03 C 2463,
2004 WL 2032147, at *5 (N.D. Ill. Sept. 9, 2004)(permitting
redaction of "names of all undercover intelligence officers as well
as any identifying information" contained in disputed documents).
In this case, redaction of all information not related to the plans
of an organization or individual with respect to the RNC does not,
as Commissioner Cohen asserts, "result[] in pages of meaningless
snippets of text and punctuation." (Cohen 6/6/07 Decl., ¶ 22).
The plaintiffs do not need to know when, where, and from whom the
defendants learned a particular piece of information regarding
planned protest activities during the RNC. In severely redacted
form, these documents still provide the plaintiffs with the
information they seek without revealing privileged or irrelevant

field intelligence report contains no mention of the RNC, or specifically states that there was no mention of the RNC at a given meeting or protest, the document need not be produced to the plaintiffs at all.[9]  The majority of the information contained in the remaining reports bears no relation to the RNC or falls within the categories that the plaintiffs have indicated they do not seek, and may therefore be redacted.  Information regarding the plans of a particular organization or individual with respect to the RNC can, in most instances, be retained without jeopardizing the confidentiality of NYPD sources or methods of investigation.

It is difficult to imagine how someone could determine the identity of an undercover officer simply from the fact that he or she was present at a meeting or protest attended by dozens, if not

_____

data.

[9] The following pages contain no mention of the RNC, state that no information regarding the RNC was obtained at a given event, or contain only a brief passing reference to RNC-related matters (for example, making posters or flyers for protests). Therefore, they need not be produced to the plaintiffs: 161-62, 497, 499-502, 504-05, 516, 519-20, 522, 524, 526-28, 530-31, 536, 541, 552, 570, 588, 592-602, 608, 612, 615, 618-19, 622-23, 625, 627, 629,  633, 636, 642-43, 649, 656, 666, 682, 685-89, 694-98, 708-09, 713-15, 718-19, 727-28, 731-32, 737-40, 745, 748, 751-53, 762-63, 766, 773, 785-87, 801-05, 819-23, 825-30, 834, 837, 839, 840-47, 850-55, 857-63, 865, 868-69, 872-75, 877-83, 886-89, 893-95, 898-99, 901, 918-19, 942-50, 958-63, 965-1032, 1049-1050, 1087-1107, 1111-20, 1203, 1123-24, 1127, 1131-37, 1140, 1142-43, 1149, 1151, 1161, 1171-73, 1176-1182, 1184, 1188-91, 1197-99, 1201-02, 1205-06, 1208-11, 1213, 1217, 1219-20, 1221-22, 1224-26, 1229, 1232-34, 1238, 1241, 1243-45, 1249-53, 1259-63, 1269, 1285, 1287, 1300, 1306, 1309, 1311, 1315.

hundreds, of people. Since the City may redact dates, locations, numbers of persons present, and other details regarding each meeting, it will be difficult in most cases to determine what meeting is being discussed. Even where it is possible to do so, it is implausible that, as the City asserts, "[w]ith data from other sources and documents, a person may determine the identity of the undercover . . . ." (Cohen 6/6/07 Decl., ¶ 18). The City does not explain with any specificity how extrinsic information would allow someone to determine which participant at any given meeting was an undercover officer. Given the extensive redactions being permitted here, that possibility is indeed remote. To the extent that any such possibility exists, it can be adequately addressed with an "attorneys'-eyes-only" designation.

The plaintiffs have indicated that they do not seek the names of individuals mentioned in the field intelligence reports. However, they do seek the names of organizations. Commissioner Cohen asserts that disclosure of the "groups or organizations about whom information is being obtained" would reveal the Intelligence Division's "methodologies." (Cohen 6/6/07 Decl., ¶ 14). Of course, "[l]aw enforcement has a legitimate interest in maintaining the confidentiality of the targets of its investigations," but that interest does not necessarily justify denying disclosure altogether. Vodak, 2004 WL 2032147, at *5. Disclosing which organizations were monitored closely by the NYPD may reveal something about the NYPD's

11

strategies, but the plaintiffs have a substantial need for that information. Without the names of the organizations whose plans are being described, the plaintiffs cannot know whether, for example, fifteen organizations or only one organization planned to commit mass civil disobedience in New York City during the RNC. The distinction is highly relevant to the City's defense.

Commissioner Cohen does not claim that any of the organizations mentioned in the field intelligence reports are the subject of a continuing investigation. While it is true that "an investigation need not be ongoing for the law enforcement privilege to apply," National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 95 (S.D.N.Y. 2000), the City does not explain how disclosure of the fact that an organization was investigated in connection with the RNC would hinder law enforcement efforts in the future. Commissioner Cohen does assert that the NYPD may in the future need to monitor some of the same organizations. (Cohen 6/6/07 Decl., ¶ 29). However, the very limited information being produced to the plaintiffs reveals nothing about police investigatory tactics beyond that fact that undercover officers or informants attended meetings of, and protests organized by, various activist organizations. This is hardly a revelation. "The use of undercover police officers to collect information about a group or organization engaged in First Amendment conduct is not a novel technique requiring protection from disclosure by the law

12

enforcement privilege." <u>Vodak</u>, 2004 WL 2032147, at *6.

Moreover, the disclosure of the end-user reports has already revealed that the NYPD monitored the plans of most of these organizations, and the plaintiffs point out that some of the end-user reports make it clear that NYPD undercover officers or informants attended activist meetings and reported back to the Intelligence Division. (Pl. Reply at 8). Presumably, then, most, if not all, of the organizations mentioned in these documents have already been alerted to the fact that they were being monitored and that undercover officers or informants may have attended their meetings prior to the RNC.[10]

Because the plaintiffs' need for the names of organizations mentioned in the field intelligence reports outweighs "the public interest in nondisclosure," <u>Kunstler</u>, 439 F. Supp. 2d 328, the names of organizations may not be redacted where they appear in the context of discussions regarding RNC-related protest activity. Concerns that disclosure will "reveal to the public where [the Intelligence Division] has been focusing its investigative efforts," thereby compromising "its ability to conduct future investigations," can be further allayed by limiting disclosure to plaintiffs'

_____

[10] The names of many of the same groups also appear, unredacted, in the documents that the City has indicated it is willing to produce to the plaintiffs (for example, Bates Nos. 1453-57, 1473-87, 1546-1612).

13

counsel.[11] <u>Vodak</u>, 2004 WL 2032147, at *8.

I have provided the City with redacted copies of the remaining field intelligence reports. In those copies, I have redacted all information that does not relate to the plans of any particular organization or individual with respect to the RNC.[12] I have also redacted a limited amount of information related to plans for the RNC where it is evident that disclosure of that information could lead to the identification of an undercover officer. With those redactions, the City must produce the field intelligence reports to the plaintiffs.

    2. <u>Other Documents</u>

As explained above, there are two other categories of documents at issue: 84 documents that the City contends are privileged in their entirety and 177 documents that the City has agreed to produce with certain limited redactions. Commissioner Cohen's declaration

---

[11] In addition, one further restriction is appropriate in light of the number of counsel involved in this litigation. Only one set of documents shall be produced and it shall be securely maintained at the offices of the New York Civil Liberties Union (the "NYCLU"), plaintiffs' counsel in these two cases. Other counsel appearing for the plaintiffs in the related cases may review the documents at the NYCLU offices but may not remove them or copy them except as necessary to submit them to the Court as sealed exhibits.

[12] One individual encountered by the NYPD repeatedly advocated destruction of property and violence against police officers. Although these comments were not always made in connection with the RNC, I have not redacted them because the documents make it clear that he planned to attend the RNC, and therefore his predilection for violence is plainly relevant. I have redacted his name, but have assigned him a pseudonym ("John Doe") to make it clear that the same individual is being referred to throughout.

says very little about these documents. The City itself notes in its brief that a claim of law enforcement privilege must be supported by an explanation of "why the specified documents fall within the scope of the privilege." (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Document Discovery ("Def. Memo.") at 5). However, Commissioner Cohen's declaration does not explain why the documents in the first category are privileged, nor does it explain why it is necessary to redact information from documents in the second category.[13] As a result, although the documents have been submitted in camera, the Court can only guess why the City believes that they are subject to the privilege. It is plainly apparent from my review of the documents that the privilege applies to at least some of the information contained in them. See Galvin v. Hoblock, No. 00 Civ. 6058, 2003 WL 22208370, at *6 (S.D.N.Y. Sept. 24, 2003) (noting that although defendants failed to "demonstrate with specificity the harm likely to flow from disclosure," in camera review revealed that documents were subject to the privilege). However, where it is not clear from the nature of the withheld or redacted information whether the privilege is applicable, the documents must be produced because the City has failed to make the required "clear showing of harm."

---

[13] These documents are mentioned several times (Cohen 6/6/07 Decl., ¶¶ 6-7, 20, 30), but Commissioner Cohen does not explain how they implicate the privilege, as he does with the field intelligence reports. (Cohen 6/6/07 Decl., ¶¶ 15-19, 22-24).

MacWade, 230 F.R.D. at 381.

    Many of the documents in the second category, which the City seeks to withhold altogether, contain no information related to planned protest activity at the RNC, and therefore need not be produced to the plaintiffs.[14] A number of other documents in this group describe in detail the NYPD's plans and strategies for its pre-RNC intelligence-gathering operation, as well as lessons learned from political demonstrations in other cities. These documents are protected by the privilege because their disclosure would likely reveal confidential law enforcement tactics.[15] A few documents in the second category do contain information regarding RNC-related protest plans and therefore must be produced, but certain privileged information may be redacted from them according to the principles set forth above.[16] I have provided copies of those documents to

---

    [14] These are Bates Nos. 411-15, 1324, 1328-55, 1364, 1371-73, 1375-78, 1394, 1398, 1403-17, and 1422. Many of these pages consist of photographs of unidentified demonstrations, individuals, and buildings.

    [15] These are Bates Nos. 387-88, 390-91, 393, 400, 1321-22, 1326-27, 1363, 1366-70, 1379-81, 1383-84, 1387, 1390-93, 1418, and 1430-46. Most of these documents do not contain information obtained by the NYPD about individual activists or organizations but rather describe the NYPD's plans for its pre-RNC intelligence-gathering operation. They therefore also fall outside the scope of the plaintiffs' request.

    [16] I have not generally redacted individuals' names from these documents, as I did with the field intelligence reports, because most of these documents do not describe interactions with individuals or their statements or actions at meetings and protests. Disclosure of the names contained in the field intelligence reports would make it easier to determine the

the defendants with redactions.[17]

The third category consists of documents that the City is willing to produce to the plaintiffs with certain redactions. Much of the redacted information is privileged. For example, the City has redacted the names and e-mail addresses of informants, NYPD officers involved in specific investigations, and members of other law enforcement agencies, as well as identifying information regarding undercover officers. Some information, including Social Security numbers, addresses, and dates of birth, appears to have been redacted to protect individuals' privacy. Other information, such as strategies that may be used by the police to counter common tactics used by demonstrators, is plainly covered by the law

---

identities of undercover officers or informants. By contrast, individuals are, for the most part, not mentioned in this second category of documents in connection with any undercover investigation. Rather, these documents simply indicate that the NYPD considered certain individuals to be of interest in the months leading up to the RNC. Disclosure of their names does not appear to pose a risk of revealing confidential methods or sources. Indeed, the third category of documents, which the City has represented that it is willing to produce, contains numerous unredacted names. The City has not explained the distinction between the names contained in this third category of documents, which it will produce voluntarily, and the names contained in the second category of documents, which it claims are subject to the privilege.

[17] Several of the documents contained in this category are identical to, or contain essentially the same information as, documents that the City has indicated it is willing to produce to the plaintiffs in redacted form. For example, 1323 contains essentially the same information as 1459. Pages 1357-1362 in the second category are identical to 1463-68 and 1802-07 in the third category.

enforcement privilege.  These redactions are therefore permissible.

In some instances, however, the City has made redactions that are not clearly supported by the policies behind the law enforcement privilege.  For example, the documents contain numerous e-mails from activist list-serves, which were then forwarded to various NYPD officers.  The City has redacted the names and e-mail addresses of those officers, but has also redacted their comments regarding the forwarded e-mails.  The City has also redacted handwritten comments on various documents.  Internal NYPD e-mails and officers' notes are not automatically subject to the privilege; as with any other type of information, the City must demonstrate that their disclosure would interfere with a law enforcement investigation.  The City has made no attempt to do so.  Accordingly, those comments may not be redacted where they contain additional relevant information or indicate what information in the document or e-mail the NYPD considered important.

Similarly, information is not privileged simply because it was obtained as a result of an undercover investigation.  The City appears to have redacted certain information on the theory that all information obtained from an undercover officer is protected by the privilege. However, as explained above, information is privileged only when its disclosure would interfere with legitimate law enforcement interests.  The mere fact that information was obtained through an undercover investigation does not render it privileged.

18

Rather, the City must make a clear and specific showing that its disclosure would jeopardize that investigation or future investigations. See Vodak, 2004 WL 2032147, at *7 (rejecting suggestion that law enforcement privilege "creates a blanket exemption from disclosure for all materials gathered in a law enforcement investigation without an analysis of the specific types of information gathered in each case and a specific showing of harm from disclosure"). For example, the City might show that the information was only available to a very limited number of persons, one of whom was an undercover officer, and that disclosure of the information would therefore reveal the identity of the undercover. The City has made no such showing here. These redactions must therefore be removed.

With respect to a number of other redactions, it is simply impossible to determine the City's reasoning from Commissioner Cohen's affidavit or from the documents themselves. I cannot determine, for instance, why the City has redacted the names of individuals who reside in New York City, but not the names of individuals who reside outside of New York City. Such redactions must be removed because the City has not adequately supported its assertion of the privilege.[18] I have provided the City with copies

---

[18] I have altered redactions on the following pages: 1449-50, 1456, 1459, 1462, 1468, 1473, 1489-97, 1501-02, 1522, 1541-45, 1623, 1626, 1637, 1642-43, 1663, 1667, 1675, 1676, 1678-79, 1684-87, 1696, 1699, 1706, 1725-26, 1800-01, 1808, 1811, 1815, 1819, 1823-24, 1829, 1831, 1832-33, 1836, 1838, 1846, 1848-49, 1852,

19

of the documents in the third category with revised redactions, and they must be produced to the plaintiffs in that form.

Conclusion

For the reasons set forth above, the plaintiffs' motion is granted in part and denied in part. The City must produce the disputed documents to the plaintiffs with redactions as set forth above. The documents shall be subject to an attorneys'-eyes-only designation as well as to the further restrictions on dissemination set forth above.


SO ORDERED.


JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       August 6, 2007

Copies mailed this date:

Christopher Dunn, Esq.
Palyn Hung, Esq.
New York Civil Liberties Union
125 Broad Street, 17th Floor
New York, New York  10004

---

1855, 1859, 1861, 1864-65, 1867, 1871, 1876, 1881, 1885, 1886, 1891, 1893, 1896, 1899, 1901, 1906, 1908, 1913, 1915, 1917, 1964, 1972-73, 1985.

20